49 CCPA

**PLANTERS NUT & CHOCOLATE COMPANY, Appellant,**

v.

**CROWN NUT COMPANY, Inc.,**
**Appellee.**
**Patent Appeal No. 6812.**

United States Court of Customs and Patent Appeals.
Aug. 15, 1962.

Mason, Fenwick & Lawrence, Boynton P. Livingston, Washington, D. C. (G. Cabell Busick, Washington, D. C., of counsel), for appellant.

Robert K. Youtie, Philadelphia, Pa., for appellee.

Before WORLEY, Chief Judge, and RICH, MARTIN, and SMITH, Judges, and Judge WILLIAM H. KIRKPATRICK.[*]

RICH, Judge.

This appeal is from the decision of the Patent Office Trademark Trial and Appeal Board (128 USPQ 345) dismissing the opposition of Planters Nut & Chocolate Company to the registration of a design mark, in the form of an animated peanut, by Crown Nut Company, Inc., application Ser. No. 5,979, filed April 9, 1956, Opposition No. 37,911. Applicant claims use only since February 17, 1953, on the goods named in the application, "Nuts, shelled and unshelled, and salted and unsalted." It is a relative newcomer.

No testimony was taken. The parties stipulated certain facts and opposer introduced with its stipulation 36 exhibits showing the long use and extensive advertising of its marks.

Appellant-opposer relies on its prior use, since 1916, of a trademark symbol consisting of a humanized peanut on the same goods as those named by applicant.

Inter alia, it has four registrations of the mark. No. 121,818, May 28, 1918, for "salted peanuts and peanut bars," is a male humanized unshelled peanut having a stovepipe hat on the top, a face on the upper part of the peanut, spindly black arms and legs and a cane held in one outstretched hand with its tip resting on the ground. Depending on how one considers the figure, the peanut shell is either the torso of the man or a long beard which conceals the torso. A monocle with a dependent cord is worn in one eye and the figure wears spats. No. 508,052 of March 29, 1949,[1] and No. 538,882 of March 6, 1951,[2] show substantially the same humanized figure having generally the same appearance as the first registration except that the nut shell is clearly a torso and not a beard, the posture is slightly changed and reversed, the hat is a dress hat lowered in the crown and bears the words "MR. PEANUT" on its band. No. 553,895 of January 22, 1952,[3] shows a Spanish version of Mr. Peanut changed from the foregoing in style by the substitution of a Spanish type low-crowned hat and the addition of a striped shawl carried on the left arm of the figure hanging to its knees.

These variant forms of appellant's Mr. Peanut have been used and advertised as set forth in the following paragraph of the stipulation:

"10. Opposer since 1916 when the MR. PEANUT DESIGN was adopted and placed in active use has had sales in excess of three hundred and fifty million dollars ($350,-000.00) of nuts and nut products under said trademark, and Opposer has expended in advertising and promoting its said trademark comprised of the humanized figure of a peanut,

[*] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge O'CONNELL, pursuant to provisions of Section 294(d), Title 28 United States Code.

[1] The goods named are "salted peanuts, peanut candy, chocolate covered peanuts, and salted assorted nuts, and peanut oil for cooking purposes."

[2] This mark is illustrated in the board's opinion. The goods named are "salted shelled peanuts, potato chips, candied and buttered pop corn and doughnuts."

[3] The goods named are "shelled salted peanuts."

in excess of ten million dollars ($10,-000,000.) during the past ten years."

The specimens of advertising in the exhibits show that this Mr. Peanut character is featured both on packages and in advertisements in different postures and engaging in various activities. He appears on billboards and in three-dimensional form in giant size on the rooftops of stores and factories.

The August 1950 issue of "Modern Packaging" magazine,[4] in an article entitled "Planters Peanuts," "twentieth of a series," shows that Mr. Peanut has been on an animated Times Square spectacular and in more than human size has been on parade floats and riding on the Atlantic City boardwalk. The article states:

"Birth of a Salesman.

"One of the most important single factors in the development of the Planters Company, aside from packaging itself, was the creation of Mr. Peanut in 1916. * * *

* * * * * *

"Mr. Peanut today appears on every package and every container filled by the company. He has star billing in advertisements and displays. Statutes of him will be found at all company buildings. He has been brought to life and is frequently seen strolling the business streets of many cities. He attends many public gatherings, likes to ride on a salesman's car and for a time he was frequently seen on the boardwalk at Atlantic City."

Under an illustration of premiums is the caption:

"PREMIUM PROMOTIONS for years have kept customers sending in coupons. Mr. Peanut is a key figure in every premium—even being sealed in fluid at top of a mechanical pencil. * * * "

There have been Mr. Peanut penny banks, salt and pepper shakers, and drinking mugs too, in which the form of Mr. Peanut has varied. As a pencil top he is a torso without legs. The drinking mugs are made only from his head and hat. On the cover of a painting book he is running between two children. In a New Year's advertisement he has even appeared as a naked babe. (Stip. Ex. No. 13.) Modern Packaging said:

"Mr. Peanut, the 34-year-old star salesman for Planters (sales are now in excess of $35 million a year), is, if not the first important personification of a product in this country, at least *the best known and most successful trade symbol of its kind to be found anywhere. Pushed to amazing popularity,* he established identity for the company's package and brand name and enabled advertising to produce maximum results at the point of sale." [Emphasis ours.]

Appellee's brief thus describes the mark it seeks to register:

"Appellee's peanut figure is a grotesque comical king having only its head represented by a peanut. The peanut head is of disproportionately large size relative to the remainder of the short body and limbs. Thus, in Appellee's figure, only the head is of the generic peanut configuration. The squatness of the body in Appellee's grotesque peanut-king is further emphasized by being fully clothed and draped with a ground-length cape abundantly trimmed with characteristically royal, ermine-dotted fur. Appellee's peanut-king figure is substantially covered by the flowing royal robes. An open crown surrounds the upper region of the peanut, with the peanut head visible through the crown. Appellee's peanut king carries a short stubby mace in one hand and wears relatively bulky buckle shoes. Prominently printed across the crown is the phrase 'Fit For A King.' Also, the face in Ap-

4. Stipulated Ex. No. 31.

pellee's peanut king is one of gaiety and glee, * * *."

The "generic peanut configuration" of appellee's mark above referred to is that of a common, *unshelled*, double-kernel peanut. But only the *configuration* of the head is "generic." The crown sits on the top of it and it is made into a caricature of a human face by placing bold features centrally on the peanut shell so that the lower end thereof is the chin. The mark is copied in the board's published opinion as is one of appellant's registered marks.

It should be made clear at the outset that appellee's total figure is not a "generic" symbol, free to all to use. The picture *of a peanut*, shelled or unshelled, would be such a symbol—an *illustration* of the goods themselves—and would be "generic" in the sense in which that term is used in trademark law, meaning purely descriptive of the goods involved, their class, or a characteristic thereof. Vandenberg, Trademark Law and Procedure, pages 2, 194. Appellee is clearly not attempting to register such a picture. What we have before us is a symbol which is not intended to show *the goods* but rather their *origin* and it has been produced in the form of a little man, having as a part of his body, and being the major feature of the mark, a double-kernel, unshelled peanut, the same type of unshelled peanut which is the major feature of opposer's marks.

With respect to the words "Fit For A King," referred to by appellee as "prominently printed," they are, in fact, relatively inconspicuous, when the mark is viewed as a whole, and on one of the specimen labels submitted to this court they do not appear at all. We do not deem them to be a significant part of the mark for the purposes of this case. Thus appellee's mark must be regarded simply as the above-described symbol in the form of a humanized peanut.

The only issue is likelihood of confusion, mistake or deception under section 2(d) of the Lanham Act (15 U.S.C. § 1052(d), 15 U.S.C.A. § 1052(d) ). The

board found that opposer's mark had become well-known in the trade and to the general public as an indication of origin for opposer's products but nevertheless concluded "that the marks of the parties are distinctly different in every *material* respect and that purchasers would not be likely to attribute products sold thereunder to a single source." (Emphasis ours.) We are unable to agree either with the premise or the conclusion.

In our opinion, formed from observation, the marks resemble each other in many *material* respects. Each is a symbol in the form of a little man based upon an unshelled, two-kernel peanut. Each is in standing position. Each has something on its head, a hat of one kind or another, or a crown. Each has human features on the shell of the peanut. In each mark, one hand is holding something, a cane or a mace, and the other hand is empty. Each symbol is basically a male version of a "humanized" two-kernel unshelled peanut—the same *kind* of nut, not different kinds of nuts. They are not different *kinds* of animations, as, for example, animal, insect or bird forms of a peanut.

Although the board found that appellant's "humanized peanut * * * has become well known in the trade and to the general public *as an indication of origin for opposer's products*" (our emphasis), the board appears to have felt that it was necessary to disregard the basic and obvious similarities between the marks and consider only their differences, in considering likelihood of confusion, because "a representation of a peanut is obviously descriptive of peanuts and products derived from peanuts." From this it apparently reasoned that anyone in the peanut business is entitled to use and register "marks consisting of or comprising fanciful or grotesque representations of peanuts *if such marks differ sufficiently from that of opposer to avoid any likelihood of confusion in trade.* * * *. [Cases cited.]" (Emphasis ours.) We are of the opinion that that is fundamentally

erroneous reasoning. Likelihood of confusion, mistake or deception of purchasers in a situation of this type, which has many times been considered by this court and its predecessor, cannot be predicated merely on a consideration of differences in the marks themselves. (See the cases considered infra following our consideration of the cases relied on by the board.)

Of course, no one can be restrained in the recognized right to *illustrate* his goods, because *pictures* of the goods are purely descriptive of them. The right to "humanize" a peanut in the form of a little man, used as a trademark, is an entirely different matter. Appellee is in no sense here exercising its right as a member of the public, engaging in the nut business to *illustrate* its product. It is, instead, asserting a right, which we do not believe it has, to tread closely on the heels of opposer's very successful trademark and promotion practices, and to acquire an exclusive right to use another little man in the form of a humanized peanut as its sales promotion device or trademark. To follow the board's reasoning could lead ultimately to everyone in the nut business "humanizing" peanuts in various forms and claiming the right to use them on the ground they are "obviously descriptive." But the right to illustrate the product is not the right to "humanize" it to form a symbol to indicate origin. Engaging in the nut business does not entitle one to adopt as a trademark a humanized version of the identical nut which has already been humanized and adopted as a trademark, *and made famous* by the advertising expenditures of another.

Opposer has undisputed priority, has established that its mark is deserving of the designation "famous," and that it became so through spending $1,000,000 a year for 10 years to advertise it. Appellee did not enter the field with its humanized peanut until long after that fame had been thoroughly established and is subject to the rule that all doubts are to be resolved against it. Over 40 years ago the Court of Appeals for the District of Columbia, in William Waltke & Co. v. George H. Schafer & Co., 263 F. 650, 49 App.D.C. 254, said:

"The case is not free from difficulty, but where there is doubt the courts resolve it against the newcomer. Lambert Pharmacal Co. v. Mentho-Listine Chemical Co., 47 App.D.C. 197. The reason for this is, as has been said by this court more than once, that the field from which a person may select a trademark is practically unlimited, and hence there is no excuse for his impinging upon, or even closely approaching, the mark of his business rival. O. & W. Thum Co. v. Dickinson, 46 App.D.C. 306; Florence Manufacturing Co. v. J. C. Dowd & Co., 178 Fed. 75, 101 C.C.A. 565. Where he does so he is open to the suspicion that his purpose is to appropriate to himself some of the good will of his competitor."

This record does not disclose that any other company in the nut business, in all the more than 40 years of appellant's having done so, is using a humanized unshelled peanut as a mark or in advertising, notwithstanding the fact, of which we take judicial notice, that humanizing a product is a common device in promoting and advertising various products.

The board supported its reasoning and conclusion by the citation of four cases which it neither discussed nor applied to the situation before it. We have carefully considered them and, as pointed out in the ensuing discussion, we do not consider them to be controlling here.

Reddy Kilowatt, Inc. v. Mid-Carolina Electric Cooperative, Inc. et al., 240 F.2d 282 (4th Cir.), dealt with a situation apparently unique in trademark law. A humanized fantastic cartoon character named Reddy Kilowatt was used for two purposes: (1) as a trademark or service mark in connection with promotional material supplied by his owner to public utilities and (2) to denote the product or service supplied by the utility com-

panies using the promotional material supplied by them to the public. Defendant used another character named Willie Wiredhand in a similar fashion. *No claim was made that Willie infringed Reddy.* The claim was that the public was confused by defendant imitating, with Willie, the many *postures and situations* in which Reddy was used by plaintiff and its licensees. The Court of Appeals affirmed the District Court's dismissal of the suit, 142 F.Supp. 851. If there is anything pertinent to the instant case in the opinion it is in the finding that animated characters are an old and common device and that nobody has a monopoly on the idea of using them. The court mentioned many such characters by name including "Planters Mr. Peanut." Insofar as the present case is concerned, appellee cites this case only for the proposition "that there are no exclusive rights in mere animation or humanization" and that is all the relevancy it has. No registration issue was present in the Reddy Kilowatt case.

Judson Dunaway Corp. v. Hygienic Products Co., 178 F.2d 461 (1st Cir.), was a suit for trademark infringement and unfair competition. Plaintiff's product was "Sani-Flush," a chemical cleaner for toilet bowls and auto radiators, and defendant sold a similar product under the trademark "Vanish." The relevant part of the case involved the use as a trademark of the figure of a woman in the act of pouring from the can into a toilet bowl, on which plaintiff had a registration held valid by the court. Defendant also used the figure of a woman in the act of pouring a powder from a can into a toilet but the figures were different, plaintiff's being "a rather dignified and matronly housewife" and defendant's being "a very slim young housewife, perhaps a bride, ultra-fashionably dressed, i. e. in a very short skirt, wearing an elaborate apron, and standing in an exaggeratedly graceful bending posture pouring into a watercloset bowl with an expression of almost ecstatic delight upon her face." The court found a "sharp contrast" between the figures.

In the Judson case the court reached its conclusion of non-infringement in steps. First it held that the mere representation of a can with material flowing from it into a toilet bowl was a "common merely descriptive element" which defendant had the right to use. The next step was to hold that defendant had a right to show the material in use "by the sort of person who would normally be expected to use it, that is, by a woman." It said this was "one of the commonest devices in all advertising." and held defendant was entitled to employ "an alluring young woman using its product." Quoting from the play "South Pacific," it said "There is nothing like the frame of a dame," of which defendant was as much entitled to take advantage as was plaintiff. It also found the other elements of the parties' labels to be such as would tend to prevent confusion, such as the word marks, backgrounds, and laudatory slogans. But as to the figures, clearly the salient point of the decision was that both parties were free, along with others, *to show the product in use* so long as the *showing* was not such as to confuse the purchasing public as to the product it was getting. No registration issue was present in the Judson Dunaway case.

Harad et al. v. Sears, Roebuck & Co., 204 F.2d 14 (7th Cir.), was a trademark infringement and unfair competition suit involving marks used on trusses for the control of hernia. It does not appear to us to be particularly relevant to the issue here. Plaintiff's mark was the word SPORTSMAN within an oval, alleged to be infringed by the figure of a runner within an oval surmounted by the words ACTIVE MAN. The trial court held the latter to be an infringement of the former. The Court of Appeals reversed, saying that the evidence showed that reproduction of figures of athletes was *very common in advertising this class of goods*. It is not clear what proposition the board cited the case for. Appellee's brief cites it for the proposition that there can be no exclusive rights in a representation of the goods, on

which the case is not in point, and as standing for the proposition that there can be no protection on a common advertising device. There is no evidence here that a humanized peanut is a common device, or has been used by anyone other than appellant until appellee started to do so. No registration issue was present in the Harad et al. case.

Jantzen Knitting Mills v. West Coast Knitting Mills, 46 F.2d 182, 18 C.C.P.A. 843, rehearing denied with opinions, 47 F.2d 954, 18 C.C.P.A. 1142, was a 3 to 2 decision refusing to sustain an opposition. Opposer Jantzen's mark was the figure of a girl with arms and legs extended in the act of diving, and wearing a swimming suit, bathing cap and stockings, all usually colored red. The applicant's mark appears to have been a similar figure similarly clad but standing on the end of a diving board in an about-to-dive position with arms extending to the rear. The Commissioner had said in the opinion under review:

"It is in evidence, * * * that the pictorial representation of a girl clad in a swimming suit *has been used by others* before either of the instant parties entered the field. It may be said that such a representation could not be appropriated in any event as a trade mark for such goods since *such a representation would be merely that of the goods themselves in the position in which they are ordinarily used* and others engaged in this same business would have a right to so illustrate their goods. These facts, therefore, lead to the conclusion that the differences between the particular representations of the girls and their positions are such that confusion in trade would not be likely." [Emphasis ours.]

Neither of the factors referred to in the italicized passages is present in this case. A majority of the court in the Jantzen case, two judges strongly dissenting, after considering the distinc-

tion between the right to illustrate the merchandise itself and trademark rights in illustrations containing added "arbitrary" matter which could function as trademarks, said:

"We hold, therefore, that appellant's trade-mark rights are limited to the figure of a girl in substantially the position shown in its registered mark, and not to the figure of a diving girl generally.

\* \* \* \* \* \*

"We think no purchaser would confuse the posture of a girl with arms and limbs extended, as in the act of diving through the air, with the posture of a girl standing on a diving board with her arms held back as if about to spring or dive into water. We may add that the diving board adds further distinctiveness to appellee's mark."

The dissenting judges believed that likelihood of confusion was obvious, concluding:

"The effect of the majority holding will probably be that trademarks of many different kinds, representing diving girls, in bathing suits, in slightly different postures, will be registered, resulting in conditions which Congress sought to prevent."

A case much more nearly in point and not mentioned by the board is this court's decision in International Latex Corp. v. I. B. Kleinert Rubber Co., 104 F.2d 382, 26 C.C.P.A. 1321. This was a design mark case. Appellee admits it is "a close decision." Applicant's mark, for babies' rubber pants, consisted in the outline drawing of two babies, clad in panties only, one shown in profile, facing to the left, and crawling. The second baby, at the right and to the rear of the first, was stooping and holding and stretching the panties on the first baby. Opposer's mark was a picture of a baby in a crawling posture with its back and rear toward the ob-

server, looking back over its left shoulder, clad in a shirt and panties and a sock and a shoe on one foot. *The court agreed with the Commissioner,* whose decision it affirmed, *that on side by side comparison "these marks could not possibly be confused, nor is it likely that a person thoroughly familiar with either would fail to distinguish the other."* [Emphasis ours.] And it agreed also with the statement: "If there is a reasonable probability that some purchasers would be deceived the second mark should not be registered." The court carefully reviewed and quoted at length from the Jantzen case, supra, declined to follow it, and unanimously concluded as follows:

"We have given the issues presented careful consideration in the light of the principles announced and applied in the Jantzen Knitting Mills case, supra, and the arguments presented by counsel for appellant, and are of opinion that the marks of the parties so nearly resemble one another that their concurrent use *would be likely to cause confusion or mistake in the mind of the public and deceive purchasers.* At least, there is a reasonable doubt as to the confusing similarity of the marks, and it is well settled that such doubt must be resolved against the newcomer in the field. American Products Co. v. Herbert F. Braithwaite, 53 F.2d 532, 19 C.C.P.A., Patents, 736." [Emphasis ours.]

There are other cases on symbol marks decided by this court which equally support the view we take of the present case. Gilmore Oil Co., Ltd. v. Wolverine-Empire Refining Co., 69 F.2d 532, 21 C.C.P.A. 943, was an opposition to registration of a picture of the head of a lion with mouth open, together with the words "Lion Head," for lubricating oils. Opposer's mark for the same goods was the head of a wolf with its mouth open, together with the words "Wolf's Head." It was argued by applicant that the marks were wholly dissimilar, that a

child could readily distinguish them. The court said:

"It is true, of course, as argued by counsel for appellant, that the distinction between a lion's head and a wolf's head, when examined for the purpose of comparison, may readily be noted. This, however, is not the test to be applied in cases of this character. * * *

"We have repeatedly held that the general purpose of the law of trade-marks is to prevent one person from trading on the good will of another and to prevent confusion, mistake, and deceit."

The opposition was sustained because, in the court's judgment, "the registration and use by appellant of its mark would be likely to lead to confusion, and would cause many purchasers of lubricating motor oil to purchase the oil of appellant, when, as a matter of fact, they desired to purchase the goods of appellee." The court also quoted with approval a passage from the Commissioner's opinion which seems apropos here:

"There seems to have been no good reason why the applicant so long after the opposer had adopted and widely used its mark should have selected a mark possessing so many features similar to those of the opposer's mark."

In Bielzoff Products Co. v. White Horse Distillers, Ltd., 107 F.2d 583, 27 C.C.P.A. 722, opposer, the owner of the mark "White Horse," including a pictorial representation of a white horse, for whisky, successfully opposed the registration of "Red Horse" for a variety of liqueurs etc. Applicant's mark consisted of the words together with a representation in red silhouette of a rearing horse with a rider thereon. Opposer also owned a registration of the mark "Black Horse," not used in this country. The goods were held to be of the same descriptive properties and the sole issue was likelihood of confusion. Appellant argued that even a child upon compari-

son would readily recognize the difference between the "White Horse" and "Red Horse" trademarks. The court, in a unanimous opinion (per Hatfield, J.) held confusion likely and also said this:

> "It would seem to be clear that if appellant is entitled to register its 'Red Horse' trade-mark for use on its alcoholic beverages in view of appellee's 'White Horse' and 'Black Horse' trade-marks, other producers of alcoholic beverages might well argue that they were entitled to the registration of such trade-marks as 'Brown Horse,' 'Gray Horse,' 'Sorrel Horse,' 'Bay Horse,' and possibly other similar marks for use on such beverages.
>
> "That the use and registration of such marks on alcoholic beverages would destroy the value of appellee's registered marks, is so apparent as to require no discussion."

Similarly, it would seem clear in the present case that the value of appellant's humanized unshelled peanut trademark, built up by advertising expenditures at ten times the annual rate of advertising shown to have been behind "White Horse," would be destroyed by use and registration of other humanized unshelled peanut marks for identical goods.

On the opposition of the owners of "White Horse," the Commissioner of Patents held, in another case, there would be likelihood of confusion by the concurrent use on whisky of the words "Silver Stallion" and the picture of a stallion standing on its hind legs. White Horse Distillers, Ltd. v. Berson, 36 US PQ 208.

The predecessor in jurisdiction of this court, in two picture trademark cases involving "Aunt Jemima" sustained oppositions, reversing the Patent Office on the ground of likelihood of confusion, to the registration of quite dissimilar pictures for the same goods. The opposer's well-known mark was the picture of a smiling negress wearing a red bandanna around her head and shoulders. In Aunt Jemima Mills Co. v. Kirkland Distributing Co., 48 App.D.C. 248, 1919 C.D. 162, the mark denied registration, because of likelihood of confusion, was a laughing male negro wearing a colonial type hat and holding in his hands a slice of red watermelon. Opposition was sustained despite many differences (obvious to any child) between the two marks. In Aunt Jemima Mills Co. v. Blair Milling Co., 50 App.D.C. 281, 270 F. 1021, the same fate befell the attempt to register the picture of a full-faced, clean-shaven, smiling male negro cook with a white cap and long apron, bearing in one hand a plate of wheat cakes and in the other hand a cake turner.

In Wayne County Preserving Co. v. Burt Olney Canning Co., 32 App.D.C. 279, 1909 C.D. 318, likelihood of confusion was found and an opposition sustained, reversing the Patent Office, as between two marks for canned foods. Applicant's mark was a full length figure of a colonial military officer. Opposer's mark was only a bust of a similar officer. The court said, inter alia, "it is the duty of the court to protect the prior registrant."

These cases were, of course, under the 1905 act but the confusion in trade clause in section 5(b) thereof differed in no respect material here from that of section 2(d) of the present statute. If anything, the former statute was slightly narrower. The law has clearly been well settled for a longer time than this court has been dealing with the problem to the effect that the field from which trademarks can be selected is unlimited, that there is therefore no excuse for even approaching the well-known trademark of a competitor, that to do so raises "but one inference—that of gaining advantage from the wide reputation established by appellant in the goods bearing its mark," [5] and that all doubt

---

5. Aunt Jemima Mills Co. v. Blair Milling Co., text supra, 50 App.D.C. at 283, 270 F. at 1023.

as to whether confusion, mistake, or deception is likely is to be resolved against the newcomer, especially where the established mark is one which is famous and applied to an inexpensive product bought by all kinds of people without much care. Peanuts and other nuts are such goods.

An unusual aspect of this case is the fact that the humanized, male, two-kernel, unshelled peanut symbol which is opposer's trademark has not been static or unchanging, but has assumed various guises. He has changed a topper for a Spanish-style hat and taken up a shawl with his cane. Premium items, which are a form of advertising appealing particularly to young children, have reproduced him in various forms. It would not be at all improbable that he should appear adorned with a crown. It is such a reasonable probability that makes confusion, in the sense of section 2(d), likely.

The decision of the board is reversed.

Reversed.

MARTIN, Judge (concurring).

I concur in the result of Judge RICH'S opinion only because a doubt as to purchaser confusion is aroused in my mind when I contemplate the concurrent use of opposer's and applicant's marks on their respective goods. This is so not because of the individual characteristics of the two humanized peanuts at issue which characteristics are very different, but because of the trademark significance of the concept itself which has been established by opposer's long exclusive (although interrupted as discussed below) usage (37 years) of a humanized male two-kernel unshelled peanut to identify its goods. Now we find, after this length of time, applicant is using the same concept for the same purpose.

Insofar as my usage of the word "exclusive" is concerned, even though there is some indication in the record that opposer has had a constant problem of endeavoring to protect its trademark which implies that others have tried to use the symbol, applicant has not brought to our attention a scintilla of evidence that anyone else besides itself has used for any appreciable time, or is using *a humanized male two-kernel unshelled peanut* to identify peanuts or any other nuts or nut products. We find only an unsupported statement by applicant which reads:

> "The representation of a peanut
> * * * has been used and registered by others in different forms."

Even in this self-serving statement, applicant does not refer to the symbol as a humanized peanut with characteristics of opposer's symbol, but says "representation of a peanut," which could mean anything from a picture of a peanut to one used as the body of an elephant.

One case which should be considered at this time is Planters Nut & Chocolate Co. v. Sessions Company, Inc., 128 US PQ 449. That was an opposition proceedings involving, as a trademark for peanut butter, a rather odd looking symbol which, I presume, is supposed to be a humanized peanut. There the board held in favor of applicant. Whether that symbol was ever registered or actually used for an appreciable time, or is now being used, is not revealed.

In that case, however, of the many third party registrations which the applicant introduced into the record, only two consisted of humanized peanuts, one for peanut butter and the other for ice cream. How long these were used or whether they are being used now is unknown to me.

All in all, even though it is apparent that there are some incidents of registration of humanized peanuts, there is nothing that has been brought to my attention which proves that opposer has not enjoyed a long exclusive (interrupted at times) usage of a humanized male two-kernel unshelled peanut to identify its goods, i. e. nuts, nut confections, and nut products.

926

WORLEY, Chief Judge (dissenting).

The mark which the Crown Company states it has been using since 1953 and which it seeks to register is:

One of the marks upon which the Planters Company bases its opposition is:

In a unanimous decision dismissing the opposition, the Trademark Trial and Appeal Board said:

" * * * Considering, however, that a representation of a peanut is obviously descriptive of peanuts and products derived from peanuts, whatever goodwill attaches to opposer's mark must necessarily lie in its particular design rather than in a representation of a peanut per se. Opposer may not, therefore, by its prior adoption and use of a design of a humanized peanut, preclude the subsequent adoption and registration by applicant and others engaged in the sale of nuts and nut products of marks consisting of or comprising fanciful or grotesque representations of peanuts if such marks differ sufficiently from that of opposer as to avoid any likelihood of confusion in trade. See: Reddy Kilowatt, Inc. v. Mid-Carolina Electric Cooperative, Inc., et al. [240 F.2d 282] 112 USPQ 194 (CA 4, 1957); Judson Dunaway Corporation v. The Hygenic [Hygienic] Products Company; The Hygenic [Hygienic] Products Company v. Judson Dunaway Corporation [178 F.2d 461] 84 USPQ 31 (CA 1, 1949); Jantzen Knitting Mills v. West Coast Knitting Mills [46 F.2d 182] 8 USPQ 40 (CCPA, 1931); and Harad et al., doing business as Industrial Engineering Associates v. Sears, Roebuck and Company [204 F.2d 14]. 97 USPQ 93 (CA 7, 1953).

"It seems clear from the above illustrations that the marks of the parties are distinctly different in every material respect and that purchasers would not be likely to attribute products sold thereunder to a single source."

Whether the board erred in so holding is the single issue for this court to decide, and our decision is necessarily controlled by the standard Congress laid down in Section 2(d) of the Lanham Act which states:

"Sec. 2. Trademarks registrable on the principal register * * *

"No trade-mark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—

* * * * * *

"(d) Consists of or comprises a mark which so resembles a mark registered in the Patent Office or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when applied to the goods of the applicant, to cause confusion or mistake or to deceive purchasers: * * *."

I find no error in the board's reasoning or conclusion. As between the board's position and the criticism levelled at it by the majority, it is no problem to choose the former over the latter.

As Judge KIRKPATRICK so clearly points out, it would be difficult to imagine two so-called humanized peanuts with less in common than is the case here. Under such circumstances it seems inescapable that the result of the *reasoning* of the majority, or more accurately put, the *nominal* majority, is to give the Planters Company a perpetual trademark monopoly domination on any and all humanized peanuts. Indeed, the majority seems to go so far as to virtually invite Planters to take over at its pleasure the mark which the Crown Company has been using since 1953 and which it seeks to register.

Although, as is generally true in trademark precedents, the cases cited by the board are not sufficiently in point to control here, it seems to me those cases give greater support to the board's reasoning than comfort to the criticism by the majority. Nor do I find any of the decisions cited by the majority sufficiently in point to control.

The concurring opinion quite correctly concedes that the "characteristics" of the instant humanized peanuts "are very different," yet concludes that the "concept" of humanizing a two kernel, unshelled peanut together with "exclusive" use for 37 years, are sufficient to prohibit registration of applicant's mark.

In the first place, I am aware of no authority, statutory or otherwise, and no reason in law or logic, why a trademark monopoly should be granted on the *concept* of humanizing the wares one seeks to sell, and no authority is cited to support that theory. Humanizing one's wares is as old as commerce itself and I had always thought was, or at least should be, free for all to do.

Second, nowhere in Section 2(d) does Congress mention "exclusive" or "non-exclusive" use. Even if it were a proper factor to be considered, opposer does not allege "exclusive" use but only "prior and extensive use." Thus it is understandable that opposer does not challenge applicant's allegation that

> "*The representation of a peanut for nuts* is not capable of broad exclusive appropriation, and *has been used and registered by others in different forms.* * * *"* (Italics supplied.)

Concrete proof of applicant's statement is found in Planters Nut & Chocolate Co. v. Sessions Co., Inc., 128 USPQ 345.

Applicant is clearly entitled to the registration it seeks. The decision of the board should be affirmed.

KIRKPATRICK, Judge (dissenting).

I think that the court's decision in this case goes beyond the boundaries of the issue before it and of its function in respect thereto.

If the Lanham Act read "No trademark shall be refused registration unless its use by the applicant would be likely to cause confusion or mistake or to deceive purchasers," or something of that sort, I could agree with the majority that "The only issue is likelihood of confusion, mistake or deception under section 2(d) of the Lanham Act," but what the Act says is that no trademark shall be refused registration "unless it * * * so *resembles* a mark registered in the Patent Office * * * as to be likely * * * to cause confusion" etc. I see no justification for writing the requirement of resemblance between the marks out of the statute.

The likelihood of confusion which, under the statute, will defeat an application to register a mark must be a likelihood arising from its resemblance to an already registered one. If there is no resemblance between the two, and the mark is not otherwise disqualified, the right to register it is absolute, and it is perfectly immaterial that the opposer, by means of his advertising, has created a situation where use of the applicant's mark would be likely to cause confusion or would impair the value of his

(the opposer's) mark or the good will created by his advertising. Such considerations are proper where an issue of unfair competition is involved, but the issue here is the extent of a clearly defined statutory right—namely, the right to register a trademark. No amount of advertising can stretch an opposer's rights to a point where he can prevent the registration by others of marks which do not resemble his.[1]

The two marks under consideration in this case simply do not resemble or come close to resembling one another, and no one could possibly mistake one for the other. The human being suggested by the opposer's mark is a dude— a spindly-legged creature, top hatted, spatted and monocled, carrying a cane; that suggested by the applicant's, a rather coarse-looking monarch, crowned, robed in ermine and carrying a mace.[2]

The majority picks out a number of particulars in which it says that the marks are similar [3] but does not appear to be quite willing to say that *taken as wholes* they resemble one another. Except for the purely abstract concept of humanizing a vegetable product, every point in the majority's catalog of similarities would be met completely by two drawings, one of Abraham Lincoln in frock coat and stovepipe hat, holding the Emancipation Proclamation in one hand and the other of Sitting Bull, with feather headdress, wielding a tomahawk. One would be hard put to it to find a resemblance there.

There being no physical resemblance between the marks, any finding that they resemble one another would have to be based upon the only thing which they have in common—namely, the idea of humanizing the product of the parties, in this case a peanut.

I cannot believe that this is what Congress intended when it spoke of one mark resembling another—certainly, at least, where the marks are representations of physical things. This is not an instance in which the competing trademarks are ordinary English words, in which case the similarity of the ideas embodied may be a consideration. Words frequently convey abstract ideas, and, since abstractions cannot be compared by eye and ear, resort to the meaning is sometimes helpful. Here the marks are pictures—line drawings—and all that is necessary is to look at them and, inasmuch as they are wholly unlike, neither the Patent Office nor the court need, or can, go further.

It seems to me that the majority is proceeding upon the assumption that it is the duty of the court in a trademark registration case to protect the value of an opposer's extensively and expensively advertised trademark and good will rather than an applicant's right under a plain statutory provision to register his mark. The majority goes to considerable length to stress the point that the value of the opposer's trademark, built up by advertising expenditures, would be destroyed by use and registration of the applicant's mark. To reach its conclusion, the majority must have based it upon a resemblance in the abstract idea stressed in the opposer's advertising rather than in the competing marks. This, I think, is not in accord with the intent of the Trademark Law.

1. In re Shakespeare Co., 289 F.2d 506, 508, 48 C.C.P.A. 969, the court, referring to its decision in In re Deister Concentrator Company, 289 F.2d 496, 48 C.C.P.A. 952, pointed out "the irrelevancy of attempts by advertising to create exclusive trademark rights in that which cannot be monopolized under the law."

2. The applicant well describes the two as a "tall and suave sophisticate" and a "stunted, midget-like gleeful king."

3. They are (with one exception to be considered later) as follows: Each
   1. is a little man, based upon an unshelled peanut,
   2. in a standing position,
   3. with something on his head,
   4. with human features on the shell of the peanut (although the features are as different as it is possible to make them),
   5. holding something in one hand, the other being empty.