**KENNER PARKER TOYS
INC., Appellant,**

v.

**ROSE ART INDUSTRIES,
INC., Appellee.**

No. 91–1399.

United States Court of Appeals,
Federal Circuit.

April 15, 1992.

Steven M. Weinberg, Weiss, Dawid, Fross, Zelnick & Lehrman, P.C., New York City, argued for appellant. With him on the brief was Carol F. Simkin.

Robert L. Epstein, James & Franklin, New York City, argued for appellee. With him on the brief was Harold James.

Before MAYER, CLEVENGER, and RADER, Circuit Judges.

RADER, Circuit Judge.

Kenner Parker Toys Inc. opposed Rose Art Industries's registration of the mark FUNDOUGH for modeling compound and related accessories. The Trademark Trial and Appeal Board dismissed the opposition discerning little, if any, likelihood that consumers would confuse FUNDOUGH with Kenner's PLAY–DOH mark. Because the Board treated the fame of Kenner's mark as a liability and otherwise improperly weighed the factors showing confusing similarity, this court reverses.

*Background*

Rainbow Crafts, one of Kenner's predecessors, first used the trademark PLAY–DOH for a modeling compound over thirty years ago. Kenner owns five federal registrations of the PLAY–DOH mark, four of which are incontestable. In Registration No. 650,035, Kenner's mark for modeling compound appears as follows:

In Registration No. 1,221,942, Kenner's mark for modeling compound and associated toys appears as follows:

Kenner now sells PLAY–DOH modeling compound nationwide in toy stores, school supply stores, grocery stores, drug stores, department stores, hobby shops, and other retail outlets. PLAY–DOH products comprised 10–15% of Kenner's total sales. In 1988, sales of PLAY–DOH products exceeded $30 million. Kenner spent over $2 million that year in advertising and promotion for products with the PLAY–DOH mark. At one time the toy industry's most advertised products, PLAY–DOH toys comprised 60–70% of the modeling compound market.

In the two- to seven-year-old age group, one in every two children currently owns a PLAY–DOH product. A survey showed that 60% of mothers named PLAY–DOH for modeling compound without any prompting. One witness characterized PLAY–DOH as a "piece of gold" which has lasted over thirty years as a successful toy—a very unusual occurrence in the toy business.

Kenner sells PLAY–DOH modeling compound in a 4–pack assortment, an 8–can RAINBOW PACK, and a 3–pound tub. Kenner also sells a variety of accessories, like molds and extruders, for use with PLAY–DOH modeling compound. In the early 1960's, Kenner's packaging began to include a fanciful character known as the PLAY–DOH boy.

The applicant, Rose Art, sells children's art and craft supplies—crayons, paints, chalkboards, stationery, and the like. In the mid–1980's, Rose Art decided to develop a water-based modeling compound. In January 1986, Rose Art adopted and began using the following mark on its modeling compound:

# FUNDOUGH

Rose Art sells its goods to many of the same retail outlets as Kenner—discount and chain toy stores, supermarkets, hobby shops, and schools. Rose Art promotes its products in catalogs and at trade shows. Rose Art does no television or print advertising of FUNDOUGH products. Although Rose Art did no widescale advertising, FUNDOUGH modeling compound sales rose from $50,000 in 1987 to over $500,000 in 1988.

Rose Art sells FUNDOUGH modeling compound in 2, 3, and 4-pack assortments. Rose Art also sells a variety of accessories, molds and extruders, similar to the PLAY-DOH products. The 1988–89 product line marked the introduction of a full line of FUNDOUGH products in connection with a bird mascot MR. DOUGH DOUGH.

In March 1986, Rose Art sought registration of its FUNDOUGH mark. Kenner opposed the mark as likely to cause confusion with PLAY-DOH. The Board dismissed Kenner's opposition. Kenner appealed.

### Analysis

### I.

■ Though accepting the Board's factual findings unless clearly erroneous, *Stock Pot Restaurant v. Stockpot, Inc.*, 737 F.2d 1576, 1578, 222 USPQ 665, 666–67 (Fed.Cir. 1984), this court reviews the Board's ultimate conclusions about confusing similarity as questions of law. *Sweats Fashions v. Pannill Knitting Co.*, 833 F.2d 1560, 1565, 4 USPQ2d 1793, 1797 (Fed.Cir.1987); *Specialty Brands v. Coffee Bean Distribs.*, 748 F.2d 669, 671, 223 USPQ 1281, 1282 (Fed.Cir.1984); *Giant Food v. Nation's*

*Foodservice*, 710 F.2d 1565, 1569, 218 USPQ 390, 394 (Fed.Cir.1983).

■ A trademark owner may oppose the registration of any competing mark "likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d) (1988). The test for likelihood of confusion does not focus on similarity of competing marks in the abstract. Rather the test evaluates objective evidence that the competing marks, when used in the marketplace, are likely to confuse the purchasing public about the source of the products. *Paula Payne Prods. Co. v. Johnson Publishing Co.*, 473 F.2d 901, 902, 177 USPQ 76, 77 (CCPA 1973).

The test for likelihood of confusion requires the Board and this court to consider evidence on a wide variety of factors. *In re E.I. duPont deNemours & Co.*, 476 F.2d 1357, 1361, 177 USPQ 563, 567 (CCPA 1973). Specifically, this court considers the thirteen factors set forth in the *duPont* case. *Id.* As dictated by the evidence, different factors may play dominant roles in determining likelihood of confusion. *Nina Ricci, S.A.R.L. v. E.T.F. Enters.*, 889 F.2d 1070, 1073, 12 USPQ2d 1901, 1903 (Fed.Cir.1989).

### II.

■ The fifth *duPont* factor, fame of the prior mark, plays a dominant role in cases featuring a famous or strong mark. Famous or strong marks enjoy a wide latitude of legal protection. *Sure-Fit Prods. Co. v. Saltzson Drapery Co.*, 254 F.2d 158, 160, 117 USPQ 295, 296 (CCPA 1958). This court's predecessor stated:

It seems both logical and obvious to us that where a party chooses a trademark which is inherently weak, he will not enjoy the wide latitude of protection afforded the owners of strong trademarks. Where a party uses a weak mark, his competitors may come closer to his mark than would be the case with a strong mark without violating his rights.

*Id.* 254 F.2d at 160. Thus, a mark with extensive public recognition and renown deserves and receives more legal protection than an obscure or weak mark.

Achieving fame for a mark in a marketplace where countless symbols clamor for public attention often requires a very distinct mark, enormous advertising investments, and a product of lasting value. After earning fame, a mark benefits not only its owner, but the consumers who rely on the symbol to identify the source of a desired product. Both the mark's fame and the consumer's trust in that symbol, however, are subject to exploitation by free riders.

A competitor can quickly calculate the economic advantages of selling a similar product in an established market without advertising costs. These incentives encourage competitors to snuggle as close as possible to a famous mark. This court's predecessor recognized that a mark's fame creates an incentive for competitors "to tread closely on the heels of [a] very successful trademark." *Planters Nut & Chocolate Co. v. Crown Nut Co.*, 305 F.2d 916, 920, 134 USPQ 504, 508 (CCPA 1962). Recognizing the threat to famous marks from free riders, this court's predecessor allowed "competitors [to] come closer" to a weak mark. *Sure–Fit Prods.*, 254 F.2d at 160. A strong mark, on the other hand, casts a long shadow which competitors must avoid. *See, e.g., Nina Ricci*, 889 F.2d at 1074.

Thus, the Lanham Act's tolerance for similarity between competing marks varies inversely with the fame of the prior mark. As a mark's fame increases, the Act's tolerance for similarities in competing marks

falls. For this reason, this court emphasizes:

> When an opposer's trademark is a strong, famous mark, it can never be "of little consequence". The fame of a trademark may affect the likelihood purchasers will be confused inasmuch as less care may be taken in purchasing a product under a famous name.

*Specialty Brands*, 748 F.2d at 675; *see also B.V.D. Licensing v. Body Action Design*, 846 F.2d 727, 730, 6 USPQ2d 1719, 1722 (Fed.Cir.1988) (Nies, J., now C.J., dissenting) ("a purchaser is less likely to *perceive* differences from a famous mark.") (emphasis in original). In accord with the same principles, this court states:

> [T]here is "no excuse for even approaching the well-known trademark of a competitor ... and that all doubt as to whether confusion, mistake, or deception is likely is to be resolved against the newcomer, especially where the established mark is one which is famous...."

*Nina Ricci*, 889 F.2d at 1074 (quoting *Planters Nut*, 305 F.2d at 924–25).

▮▮ The Board erred in discounting the import of Kenner's famous prior mark. The Board acknowledged "the renown of opposer's mark with respect to modeling compound." Indeed, Rose Art conceded this fame. Yet the Board treated that fame as a liability in assessing likelihood of confusion. Reasoning that consumers might more easily recognize variances from a famous mark, the Board concluded that the fame of Kenner's mark permitted greater, rather than less, legal tolerance for similar marks.

While scholars might debate as a factual proposition whether fame heightens or dulls the public's awareness of variances in marks, the legal proposition is beyond debate. The driving designs and origins of the Lanham Act demand the standard consistently applied by this court—namely, more protection against confusion for famous marks.

Even in their earliest common law origins,[1] trademarks functioned to benefit

---

**1.** *See* 1 Jerome Gilson, *Trademark Protection &* *Practice* § 1.01 (1990) for a discussion of *South-*

both producers who invest their good will and capital in a trademark and consumers who rely on those symbols. *See United Drug Co. v. Theodore Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 50–51, 63 L.Ed. 141 (1918) (A trademark's "function is simply to designate the goods as the product of a particular trader and to protect his good will against the sale of another's product as his."). By identifying the source of products, a trademark brought consumers back often to buy from a reliable producer and thus provided economic rewards for excellence. Thus, trademarks both encourage quality products and reduce consumers' costs for market searches. At the same time, trademarks protected investments of property owners and ensured proper return to those who invested work and capital. *See Trade–Mark Cases*, 100 U.S. 82, 92, 25 L.Ed. 550 (1879) (In analyzing "[t]he whole system of trade-mark property," the Court designated a trademark as a "property right."); *cf. Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 413, 36 S.Ct. 357, 360, 60 L.Ed. 713 (1916) ("trade-marks ... classed among property rights").

These manifold purposes and benefits of the Lanham Act only operate, however, if investments to secure a strong, recognizable mark bring the reward of certain legal protection. If investors forfeit legal protection by increasing a mark's fame, the law would then countenance a disincentive for investments in trademarks. The law is not so schizophrenic. In consonance with the purposes and origins of trademark protection, the Lanham Act provides a broader range of protection as a mark's fame grows.

The Board erred by reading a statement from *B.V.D.* to undercut the legal standard for famous marks. *See* 846 F.2d at 729. ("The fame of a mark cuts both ways with respect to likelihood of confusion. The bet-

ter known it is, the more readily the public becomes aware of even a small difference.") Even a summary examination of this court's treatment of famous marks, however, shows that the Board read that statement out of context. Both before and after *B.V.D.*, this court has consistently afforded strong marks a wider latitude of legal protection than weak marks. For cases before *B.V.D.*, *see, e.g., Sure–Fit*, 254 F.2d at 158; *Planters Nut*, 305 F.2d at 924–25; *Specialty Brands*, 748 F.2d at 674. For a case after *B.V.D.*, *see Nina Ricci*, 889 F.2d at 1074. Indeed, the Board's misreading of *B.V.D.* also conflicts with its own precedent before and after *B.V.D.* *See, e.g., McDonald's Corp. v. McKinley*, 13 USPQ2d 1895, 1900 (Trademark Trial & Appeal Bd.1990) ("[C]ase law holds that a well-known or famous mark is entitled to a broader scope of protection than one which is relatively unknown."); *R.J. Reynolds Tobacco Co. v. R. Seelig & Hille*, 201 USPQ 856, 860 (Trademark Trial & App.Bd.1978) ("It is well recognized that the law today rewards a famous or well known mark with a larger cloak of protection than ... a lesser known mark."); *General Foods v. ITT Continental Baking Co.*, 196 USPQ 189 (Trademark Trial & App.Bd.1977). The holding of *B.V.D.*, to the extent it treats fame as a liability, is confined to the facts of that case.

An examination of the competing marks in this case illustrates well the significance of a famous mark in assessing the *duPont* factors. PLAY and FUN, in the overall context of these competing marks, convey a very similar impression. Both are single syllable words associated closely in meaning. Particularly in the context of a child's toy, the concepts of fun and play tend to merge. In context, the prefixes PLAY and FUN seem at least as similar as TREE and VALLEY or ISLAND and VALLEY—components of the confusingly similar marks SPICE TREE and SPICE VALLEY, *Spice*

*ern v. How,* a 1618 opinion by English Common Pleas Judge Doderidge. In this earliest reference to trademarks in the King's courts, the Judge sustained the action of a high-quality clothier against a maker of ill-made cloth who affixed the mark of the high-grade clothier to inferior products. This early case illustrates

that trademarks function as guarantors of quality, suppliers of information to consumers seeking a reliable source of products, insurers of proper allocation of reward to investors in the good will and reputation of a trade name, in short, preservers of property rights and responsibilities.

*Islands v. Frank Tea & Spice Co.,* 505 F.2d, 1293, 184 USPQ 35 (CCPA 1974), and the confusingly similar marks SPICE IS-LAND and SPICE VALLEY, *Specialty Brands,* 748 F.2d at 676. Indeed the Board acknowledged "similarities in meaning between the terms 'PLAY' and 'FUN.'"

The single-syllable suffixes DOH and DOUGH[2] sound the same. In light of a modern trend to simplify the spelling of "gh" words, consumers may even perceive one as an interchangeable abbreviation for the other. Again, the Board alluded to the unrebutted testimony of Dr. William Stewart who noted the "graphic confusability" of these two terms.

Despite the dangers that consumers may receive the same commercial impression from both marks, the Board incorrectly discounted the evidence of similarity due to the fame of PLAY–DOH. In a correct assessment of the *duPont* factors, the fame of PLAY–DOH should have magnified the significance of these similarities. In the context of a far less famous mark—FUN FACTORY—the Board properly perceived PLAY FACTORY as confusingly similar. *General Mills Fun Group v. Channel Cos.,* 183 USPQ 367 (Trademark Trial & App.Bd.1974). Giving proper weight to the strength of Kenner's mark, this court reaches a similar result in this case.

### III.

■ Examination of several other *du-Pont* factors underscores the Board's error in discounting the fame of opposer's mark. The marks PLAY–DOH and FUNDOUGH are used for practically identical products, namely modeling compounds and related modeling accessories. *See, e.g., Specialty Brands,* 748 F.2d at 672. Both Kenner and Rose Art market their products in practically identical channels of trade, namely toy outlets. *Id.* Kenner's lengthy and extensive use of the PLAY–DOH mark on a wide variety of toy products emphasizes the mark's fame and strength.

Both marks appear on inexpensive products purchased by diverse buyers without exercising much care. This factor accentuates the significance of a famous mark. *Id.* at 676.

■ In the event of doubts about the likelihood of confusion, the Board and this court should resolve those doubts against the newcomer, *Geigy Chemical v. Atlas Chemical Industry,* 438 F.2d 1005, 1008, 169 USPQ 39, 40 (CCPA 1971); *Planters Nut,* 305 F.2d at 920, especially when the established mark is famous. *Nina Ricci,* 889 F.2d at 1074. In sum, application of the various *duPont* factors to this case suggests that the Board erred as a matter of law in concluding that FUNDOUGH is not confusingly similar to PLAY–DOH. The Board was wrong to disregard this glaring evidence and resolve doubts in the applicant's favor.

Adding to the overall similarity of the competing marks' commercial impression discussed above is the similarity of trade dress. As this court has stated:

> Ordinarily, for a word mark we do not look to the trade dress, which can be changed at any time. *Vornado, Inc. v. Breuer Electric Mfg. Co.,* 390 F.2d 724, 156 USPQ 340, 342 (CCPA 1968). But the trade dress may nevertheless provide evidence of whether the word mark projects a confusingly similar commercial impression.

*Id.* 748 F.2d at 674. The multitude of similarities in the trade dress of PLAY–DOH and FUNDOUGH products cries out for recognition. The color (dominated by yellow), size, and shape of the packaging for both products is the same. Comparable fictitious characters in a hat adorn the packaging of both products. Both products feature promotions—discounts, rebates, and the like—in a circle with serrated edges. The marks themselves appear in coinciding locations on both products' packages. The instructions and color charts on both packages are nearly identical. Both products display a rainbow motif. These trade dress features and more—original to

**2.** This court declines to opine about whether "dough" is generic in relation to water-based

modeling compounds because it is unclear that this issue properly arose before the Board.

PLAY–DOH—have appeared on products bearing the FUNDOUGH mark. The trade dress of the marks enhances their inherently similar commercial impression.

### Conclusion

Kenner has shown that the FUNDOUGH mark when used in connection with toy molding compounds and related accessories is likely to cause confusion, mistake, or deception. In discounting the import of the famous PLAY–DOH mark and in improperly weighing the *duPont* factors, the Board erred. Therefore, the Board's dismissal of Kenner's opposition is

REVERSED.