69 F.3d 555
 NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
CONTINENTAL GRAIN COMPANY, Appellant,
v.
CENTRAL SOYA COMPANY, INC., Appellee.
 No. 95-1249.
 United States Court of Appeals, Federal Circuit.
 Nov. 6, 1995.
 
 Before NEWMAN, MICHEL and RADER, Circuit Judges.
 MICHEL, Circuit Judge.
 
 
 1
 Continental Grain Company (Continental), owner of the registered trademark, PEAK DARI, Registration No. 1,458,976, for livestock feed supplement, appeals the decision of the Trademark Trial and Appeal Board (Board) dismissing Continental's opposition to registration of Central Soya Company's (Central) HI PEAK mark for feed supplements. Because we agree with the Board's conclusion that there is no likelihood of confusion between the marks, and because we cannot say that the Board clearly erred in its finding that the mark HI PEAK is suggestive, we affirm.
 
 DISCUSSION
 
 2
 Continental opposed registration of the trademark on two grounds: (1) that there existed a likelihood of confusion under 15 U.S.C. Sec. 1052(d) (1994), and (2) that under 15 U.S.C. Sec. 1052(e) (1994) the mark was not entitled to registration because it was "merely descriptive." The Board dismissed the opposition on both counts, holding that there was no likelihood of confusion and finding the mark "simply suggestive" rather than merely descriptive. We address each issue in turn.
 
 
 3
 1. The Board did not err in holding that there was a likelihood of confusion:
 
 
 4
 Though accepting the Board's factual findings unless clearly erroneous, this court reviews the Board's ultimate conclusions about confusing similarity as questions of law. Kenner Parker Toys v. Rose Art Indus., Inc., 963 F.2d 350, 352, 22 USPQ2d 1453, 1455 (Fed.Cir.), cert. denied, 113 S.Ct. 181 (1992).
 
 
 5
 Under the Lanham Act, a trademark owner may oppose the registration of any competing mark "likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. Sec. 1052(d) (1994). The test for likelihood of confusion does not focus on similarity of competing marks in the abstract, but compels an evaluation of objective evidence that the competing marks, when used in the marketplace, are likely to confuse the purchasing public about the source of the products. This court considers the thirteen factors, as relevant in each case, enunciated in In re E.I. duPont deNemours & Co., 476 F.2d 1357, 1361, 177 USPQ 563, 567 (CCPA 1973). As dictated by the evidence, different factors may play dominant roles in determining likelihood of confusion. See Nina Ricci, S.A.R.L. v. E.T.F. Enters., 889 F.2d 1070, 1073, 12 USPQ2d 1901, 1903 (Fed.Cir.1989). Similarity of the goods, similarity of the marks (i.e., comparing their "sight, sound, and meaning"), sophistication of the purchasers, conditions of purchase, and presence/absence of actual confusion were relevant factors in this case.
 
 
 6
 Continental first argues that the Board erred as a matter of law in comparing the "HI" to "DARI" components of the respective marks, and on deciding on the basis of this "dissection," rather than on an analysis of the marks in their entirety, that HI PEAK and PEAK DARI were dissimilar in sight, sound, and meaning. See In re National Data Corp., 753 F.2d 1056, 1058, 224 USPQ 749, 751 (Fed.Cir.1985) ("[L]ikelihood of confusion cannot be predicated on dissection of a mark, that is, on only part of a mark."); see also McCarthy on Trademarks and Unfair Competition Sec. 23.15 (3d ed. 1994).
 
 
 7
 Continental ignores, however, that the Board in its analysis acted within the anti-dissection rule under our precedent in analyzing the "common weak elements" of the marks. Where the common element of conflicting marks is "weak" in the sense that such portion is descriptive, highly suggestive, or is in common use by many sellers in the market, then this reduces the likelihood of confusion. See Clark Equip. Co. v. Baker-Lull Corp., 288 F.2d 926, 129 USPQ 220 (CCPA 1961) (no confusion between YARDLOADER and CARLOADER or YARDLIFT on forklift trucks); In re Bed & Breakfast Registry, 791 F.2d 157, 229 USPQ 818 (Fed.Cir.1986) (no likelihood of confusion between BED AND BREAKFAST REGISTRY and BED AND BREAKFAST INTERNATIONAL, because the common part was the weak and descriptive phrase "bed and breakfast"). Thus, where the mark is a composite of a weak common part and a modifying phrase, the court holds that the common portion of the composite mark is to be given less weight on the rationale that the public will look to other portions of the marks and will not be confused unless the other portions are similar. See Keebler Co. v. Murray Bakery Prods., 866 F.2d 1386, 9 USPQ2d 1736 (Fed.Cir.1989) (As a preliminary to comparing the marks in their entireties, it is not improper to give less weight to the descriptive "pecan" part of the marks in finding no likelihood of confusion in comparing PECAN SANDIES for pecan cookies to PECAN SHORTIES for pecan cookies.).
 
 
 8
 In this case, the Board found that the point of similarity of the marks was the word "peak," and that it was undisputed that "peak" had a common meaning in the dairy industry. The Board also noted that a competitor had used the trademark PEAK PLUS--further supporting its conclusion that within the dairy industry "peak" had common meaning. Then the Board went on to compare the dominant words of the two marks: "HI" and "DARI"--and appropriately found that they were completely dissimilar in sight, sound and meaning. Thus, the Board appropriately gave less weight to the "peak" part of each mark and compared the words modifying "peak" in each of the respective marks.
 
 
 9
 Second, Continental contends that the Board inappropriately relied on the sophistication of consumers to the exclusion of other factors that Continental argues were relevant, i.e., the presence of direct competition, identical channels of trade, same consumers, and sales at the same outlets, in finding no likelihood of confusion. Initially, we address Continental's reliance on In re Shell Oil Co., 992 F.2d 1204, 1208-09, 26 USPQ2d 1687, 1690-91 (Fed.Cir.1993), for the proposition that sophistication of consumers can never be dispositive. In Shell Oil we held only that in that case sophistication of consumers was not dispositive because there were other relevant factors. Id.
 
 
 10
 Nor does the Board rest its decision on the sophistication of consumers factor alone. Thus, although the Board finds that the farmer purchasers were highly sophisticated consumers who expended a great deal of time and consideration in tailoring feed formulations to match their cattle's requirements, it also finds that the product distribution and sale were highly individualized via sales calls, that there were established relationships with representatives, and that the product was shipped directly from the manufacturer to the farmer.[1] In short, this was not a product the purchasers chose from a shelf. Additionally, the Board found that feed and feed supplements represented a major, if not the major, expense and "critical factor" in dairy farming because of the cost of the products and the direct relationship to the health and milk production of the cattle. Thus, in spite of the fact that the Board concluded that the products and the purchasers were essentially the same, given the sophistication of the consumers, the importance of feed in milk production, and the level of expenditure involved, the Board reasoned that the "marks would have to be quite similar" to create a likelihood of confusion. The Board then compared the marks and found their non-descriptive portions completely different, and concluded that a likelihood of confusion was not shown. Because the Board did not fail to consider any relevant duPont factor and reasonably discussed all of the relevant factors, we are unpersuaded that the Board's emphasis on the sophistication of the consumers constituted legal error.
 
 
 11
 Finally, we note that Continental's argument that the Board did not consider the trademarks in the marketplace, but only in the abstract, evidences a fundamental misunderstanding of the duPont factors themselves. The factors considered by the Board--sophistication of consumers, conditions of purchase, expense and care of purchase, and similarity of meaning, sound, and sight of the marks--are factors analyzing the marks in the marketplace.
 
 
 12
 Because we agree with the Board's analysis that any potential for a likelihood of confusion is negated by the sophistication of the buyers, conditions of purchase, and dissimilarity of the marks themselves, we affirm the Board's legal conclusion that no likelihood of confusion was shown.
 
 
 13
 2. The Board did not clearly err in finding the mark suggestive:
 
 
 14
 The Board found that the HI PEAK mark as used on feed supplements was not merely descriptive, but simply suggestive because it found "that it would take some thought and imagination for a dairy farmer, upon encountering the mark HI PEAK on dairy feed, to understand this feed [to] increase a cow's 'peak' vis-a-vis a situation where that cow was simply given ordinary feed." Whether a mark is ineligible for registration as merely descriptive under 15 U.S.C. Sec. 1052(e) is a question of fact which we review for clear error. In re Merrill Lynch, Pierce, Fenner & Smith, Inc., 828 F.2d 1567, 1570, 4 USPQ2d 1141, 1143 (Fed.Cir.1987).
 
 
 15
 As distinguished from descriptive marks, suggestive marks merely suggest, rather than describe, some quality or ingredient of goods. McCarthy Sec. 11.20. The fact that HI PEAK suggests a higher peak for lactation is good and not necessarily a fatal flaw. See Continental Scale Corp. v. Weight Watchers Int'l, Inc., 517 F.2d 1378, 1380, 186 USPQ 321, 323 (CCPA 1975) ("[A]s we have often pointed out and as is very well understood, suggestive words may be and frequently are very good trademarks.").
 
 
 16
 The Board analyzed the mark using the most common test: the "degree of imagination" test. Under the imagination test, the question is how immediate and direct is the thought process from the mark to the particular characteristic of the product. Thus, if one must exercise "mature thought or follow a multi-stage reasoning process" to determine attributes of the product or service, the term is suggestive, not descriptive. See In re Tennis in the Round, Inc., 199 USPQ 496 (TTAB 1978) (TENNIS IN THE ROUND held not descriptive of tennis facilities). If the mental leap between the word and the product's attributes is not virtually automatic and instantaneous, this strongly indicates suggestiveness. McCarthy Sec. 11.21.
 
 
 17
 Continental contends that the Board clearly erred in its finding of suggestiveness because its opinion stated that "there [was] in the record not one example of any use of either 'high peak' or 'hi peak' by anyone other than applicant, who makes use of this term only in a trademark sense, that is as HI PEAK," when in fact there was evidence in the record of competitors using the phrase "high peak" in both its suggestive and descriptive sense.
 
 
 18
 Although Continental contends that it introduced "many" examples of the phrase "high peak" being used descriptively by competitors, we only find one of record on appeal: an advertisement by Supersweet Feeds wherein Supersweet claims that "[e]arly lactation rations help you achieve higher peak production." Continental's remaining examples concern references in articles and advertisements to "peak," "peak milk production," "peak potential," "peak milk," "high peak milk," and "peak energy." Most of these examples concern the usage of "peak," which the Board appropriately found had a common meaning, and thus cannot show that the Board clearly erred in its findings. One of Continental's examples, "high peak milk," may be descriptive of milk, but does not describe feed, and, therefore, also cannot demonstrate clear error by the Board.
 
 
 19
 We acknowledge, however, that Continental's example of Supersweet's usage of "higher peak" calls into question the Board's finding because the advertisement uses a phrase that sounds virtually identical to the mark HI PEAK to describe what its product does. We also acknowledge that this is a close case on the facts. However, Continental still fails to demonstrate that the Board clearly erred. Here, the Board found that the mark was suggestive because it found, in the absence of any contrary evidence, that a dairy farmer's association with the term "high peak" as used on feed products was not automatic and instantaneous, i.e., it was not immediately clear to the farmer that a product so labelled would increase a cow's peak lactation. Moreover, the Board noted that there was no evidence of record indicating how dairy farmers react to the term HI PEAK when used not in regard to a lactation cycle as in most of the exemplars of record, but in regard to feeds and feed supplements. A single example of a usage of the phrase to describe a similar product, without any evidentiary showing that dairy farmers would associate the mark immediately with an increase in a cow's milk production at the peak of its lactation cycle, does not require us to reverse the Board's finding under the clearly erroneous standard of review. That the Board could have found to the contrary is immaterial. Therefore, because Continental has not shown that the Board clearly erred in its underlying finding that dairy farmers would need to do some reasoning to make the connection that the feed supplement would increase the amount of milk produced at a cow's lactation peak, and in the absence of evidence indicating otherwise, we cannot conclude that the Board's ultimate finding of suggestiveness is clearly erroneous.
 
 CONCLUSION
 
 20
 Because we cannot disagree with the Board's legal conclusion that no likelihood of confusion between the marks HI PEAK and PEAK DARI was shown, and because we are unpersuaded that the Board's factual finding that the mark HI PEAK is suggestive is clearly erroneous, we affirm.
 
 
 
 [1]
 In its brief, Central in fact states that less than 1% of the product is sold through joint sales representatives. It is clear, however, that the sort of confusion generated by a purchase of a low-cost item at a store or outlet is not present here