THIS OPINION IS A
PRECEDENT OF THE TTAB

Hearing:                                    Mailed:  March 7, 2007
April 27, 2006                                               PTH

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Leading Jewelers Guild, Inc.
v.
LJOW Holdings, LLC substituted for SJD LLC as
party defendant[1]

_____

Opposition No. 91160856
Cancellation Nos. 92041930 and 92042246

_____

Todd E. Stockwell and Christopher T. Smedley of Stockwell &
Associates, PSC for Leading Jewelers Guild, Inc.

Arthur J. Greenbaum and Sujata Chaudhri of Cowan, Liebowitz
& Latman, P.C. for LJOW Holdings, LLC.

_____

Before Seeherman, Hohein and Hairston, Administrative
Trademark Judges.

Opinion by Hairston, Administrative Trademark Judge:

LJOW Holdings, LLC (hereinafter "Defendant") seeks to

register the mark LEADING JEWELERS OF THE WORLD and design

as shown below,

---

[1] During this proceeding, the involved application and
registrations were assigned from SJD LLC to LJOW Holdings, LLC.
The Board, in an order issued October 24, 2006, substituted LJOW
Holdings, LLC as the party defendant herein.



for "indicating membership in an organization which sells diamond jewelry."[2]  Defendant is also the owner of registrations on the Supplemental Register for the mark LEADING JEWELERS OF THE WORLD (in standard character form) for both "indicating membership in an organization which sells diamond jewelry,"[3] and "association services, namely, promoting the interests of vendors of quality diamonds and diamond jewelry."[4]

Leading Jewelers Guild, Inc. (hereinafter "Plaintiff") has respectively opposed registration of the application and petitioned to cancel the registrations for the above marks.[5] Plaintiff alleges that it is a nationwide member-owned cooperative association of jewelers doing business under the mark MEMBER LEADING JEWELERS GUILD; that since April 23, 1979 it has used the registered mark MEMBER LEADING JEWELERS GUILD and design, as shown below

---

[2] Serial No. 78244958, filed May 2, 2003, alleging a date of first use anywhere and a date of first use in commerce of May 1, 2002.  The words LEADING JEWELERS OF THE WORLD have been disclaimed apart from the mark as shown.
[3] Registration No. 2703309, issued April 1, 2003.
[4] Registration No. 2716705, issued May 13, 2003.
[5] The Board, in its order issued on March 14, 2005, consolidated these proceedings.



for "indicating membership in an organization consisting of jewelry distributors,"[6] and that defendant's LEADING JEWELERS OF THE WORLD marks so resemble plaintiff's MEMBER LEADING JEWELERS GUILD and design mark as to be likely to cause confusion.

Defendant has answered the notice of opposition and petitions for cancellation by denying the salient allegations thereof.

The record includes the pleadings, and the files of the opposed application and involved registrations. Plaintiff has submitted the testimony, with exhibits, of its executive director, James West; and a notice of reliance on a copy of its pleaded registration and defendant's answers to plaintiff's first set of interrogatories. Defendant submitted the testimony, with exhibits, of Jack Gredinger, executive director of defendant's "Leading Jewelers of the

---

[6] Registration No. 1476369, issued February 9, 1988. Affidavits under Section 8 and 15 have been accepted and acknowledged respectively.

World" program, and Sheldon J. David, executive vice president of W.B. David & Company. In addition, defendant submitted a notice of reliance on two third-party registrations for marks which include the words LEADING JEWELER for services in the jewelry field.

Briefs have been filed and an oral hearing, attended by counsel for the parties, was held.

The Parties

According to its executive director, James West, plaintiff is a "a co-op of family owned independent jewelers" which was "created to pool their buying resources in order to get more advantageous buys in merchandise and advertising and in any other area where we can bring our group to bear." (Dep. at 7). Mr. West testified that plaintiff first used MEMBER LEADING JEWELERS GUILD and design as a membership mark on April 23, 1979. At the end of 2004, plaintiff had 27 members with 150 stores in 32 states. Plaintiff offers its members several services, including advertising and catalog production, merchandise buying programs for discounts, and a warranty service for its members to offer customers. Plaintiff's MEMBER LEADING JEWELERS GUILD and design mark is used on catalogs, newspaper advertisements and inserts, and mailers which are sent by members to customers. The mark also appears on signs at members' stores, on bags, wrapping and stickers

that are used by members when packing items for customers, and on warranties, service contracts, repair envelopes, repair tickets, credit contracts, and installment contracts. According to Mr. West, the total circulation of catalogs that plaintiff produced for its members in 2003 was approximately 17 million. In addition, for the same year, plaintiff, "as a group collectively," spent approximately $11 million on advertising. (Dep. at 35).

Sheldon David, executive vice president of W.B. David & Company, testified that in 2000, "he thought up the name" LEADING JEWELERS OF THE WORLD for use in connection with a program "directed to a specific group of retailers throughout the United States that could meet certain criteria of being able to fill that, if you want to call it, area of adding value to the sale of diamonds." (Dep. at 9). According to Mr. David, W.B. David & Company formed a limited liability company, SJD LLC (now LJOW Holdings, LLC), to own the trademark LEADING JEWELERS OF THE WORLD. The LEADING JEWELERS OF THE WORLD program is administered by LJW Associates, Inc. pursuant to an oral license. The LEADING JEWELERS OF THE WORLD mark has been used in connection with association services since at least as early as May 31, 2001 and as a membership mark since September 20, 2001. Jack Gredinger, executive director of the LEADING JEWELERS OF THE WORLD program, testified that the program is "more about how

the jeweler treats the customer than about the products that the retail jeweler sells." (Dep. at 11). In this connection, defendant provides to its members an in-store training program geared primarily towards providing a luxury shopping experience to the public. The typical member of the LEADING JEWELERS OF THE WORLD program is "a single store operation" which sells "higher-priced, more quality-oriented product[s]." (Dep. at 67). According to Mr. Gredinger, "[t]hey tend to be premier retailers in the marketplace." (Dep. at 67). From 2001 to 2004, defendant spent approximately $4 million on "putting the [LEADING JEWELERS OF THE WORLD] program together." (Dep. at 67). In 2004, 42 retail jewelers belonged to defendant's LEADING JEWELERS OF THE WORLD program, and in the same year defendant spent between $4 and 5 million on advertising. Much of defendant's advertising is directed to attracting new members to its program.

Priority

The record demonstrates that plaintiff first used its mark, MEMBER LEADING JEWELERS GUILD and design, on April 23, 1979 to indicate membership in its organization. Further, the record shows that defendant first used the LEADING JEWELERS OF THE WORLD mark in connection with association services on May 31, 2001, and to indicate membership in its

organization on September 20, 2001.  Thus, priority rests with plaintiff in the opposition and cancellations.

Likelihood of Confusion

Our determination of the issue of likelihood of confusion is based on an analysis of all of the probative facts in evidence that are relevant to the factors set forth in In re E. I. duPont de Nemours & Co., 476 F.2d 1357, 177 USPQ 563 (CCPA 1973).  See also, In re Majestic Distilling Company, Inc., 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003).

At the outset, we note that plaintiff's Registration No. 1476369 identifies a collective membership mark; defendant's Application Serial No. 78244958 and Registration No. 2703309 identify collective membership marks; and defendant's Registration No. 2716705 identifies a service mark.  As the Board stated in Carefirst of Maryland, Inc. v. FirstHealth of the Carolinas, Inc., 77 USPQ2d 1492, 1512 (TTAB 2005):

> Although the ultimate inquiry is the same, the analysis under Section 2(d) with respect to collective membership marks is somewhat different from that with respect to trademarks or service marks.  The trademark or service mark analysis typically involves a determination of likelihood of confusion among purchasers or users as to the source of goods or services.  However, a collective membership mark does not involve purchasers of goods or services.  The sole purpose of a collective membership mark is to indicate membership in an organization.  While goods and services may be provided by members of an organization, a collective membership mark, as

> used or displayed by the members of an
> organization, serves only to identify the fact
> that such members belong to the collective
> organization and to inform relevant persons of the
> members' association with the organization.
> (citation omitted)

In addition, the Board indicated at 77 USPQ 1513 that:

> The term "relevant persons," for purposes of a
> collective membership mark, would not consist of
> "purchasers," but rather those persons or groups
> of persons for whose benefit the membership mark
> is displayed.  (citation omitted)

Thus, in the case of plaintiff's collective membership mark and defendant's collective membership mark, the question is whether relevant persons are likely to believe that there is some connection between the collective organizations, i.e., plaintiff and defendant.  And, in the case of plaintiff's collective membership mark and defendant's service mark, the question is whether relevant persons are likely to believe that the collective organization, i.e., plaintiff, is endorsed by or in some way associated with the provider of the association services, i.e., defendant.

It is essentially defendant's position that there is no likelihood of confusion because its collective membership mark and service mark are encountered primarily by single store jewelry retailers who sell higher-priced products, whereas plaintiff's collective membership mark is encountered primarily by chain-store jewelry retailers with stores located in shopping malls.  However, the problem with

8

this argument is that the involved application and registrations contain no such restrictions with respect to type of jewelry retailers, distributors, or vendors. See Paula Payne Products v. Johnson Publishing Co., 473 F.2d 901, 177 USPQ 76, 77 (CCPA 1973) ("Trademark cases involving the issue of likelihood of confusion must be decided on the basis of the respective descriptions of goods"). In the absence of any limitations, we must assume, for purposes of our likelihood of confusion analysis, that "low-end" and "high-end" jewelry retailers, distributors, and vendors would encounter both plaintiff's collective membership mark and defendant's collective membership mark and service mark. In short, we cannot draw the distinctions urged by defendant with respect to the relevant persons, but rather must deem them to be, at the very least, overlapping.

Further, we note that plaintiff's collective membership mark and defendant's collective membership mark may be displayed or promoted in rendering jewelry retail store or distributorship services to consumers so as to advertise the member's affiliation with the respective membership organization even if the jewelry retail store or distributorship services are being offered under a different mark. Boise Cascade Corp. v. Mississippi Pine Manufacturers Association, 164 USPQ 364 (TTAB 1969). Similarly, defendant's service mark may be displayed or promoted in

rendering jewelry retail store or distributorship services to consumers so as to advertise the store's association with defendant.  Indeed, the testimony shows that the respective marks are used in these manners.

Under the circumstances, plaintiff's collective membership mark and defendant's collective membership mark and service mark would be encountered by some of the same members of the relevant public, who could include businesses and vendors of jewelry, as well as the ultimate purchasers of jewelry.  Thus, this factor favors a finding of likelihood of confusion.

We next take up the factor of fame, because fame of the prior mark plays a dominant role in likelihood of confusion cases featuring a famous mark.  Kenner Parker Toys, Inc. v. Rose Art Industries, Inc., 963 F.2d 350, 22 USPQ2d 1453 (Fed. Cir. 1992).  Plaintiff argues that "[b]ased on [the] widespread physical display of its mark, its large advertising expenditures, and length of use, [plaintiff's] mark has acquired a level of fame that increases the likelihood of confusion by a similar mark such as [defendant's]. (Brief at 27).

However, we find that the evidence plaintiff has submitted is not sufficient to demonstrate that its mark is famous.  The record shows that 27 members (with 150 retail stores) belong to plaintiff.  This number of members,

10

standing alone, is not particularly impressive.  In addition, although plaintiff has used its collective membership mark since 1979, it offered figures relating to advertising and catalog circulation for the year 2003 only. Such figures for a single year are not especially meaningful.  Moreover, as stated by the Federal Circuit, "[r]aw numbers of product sales and advertising expenses may have sufficed in the past to prove fame of a mark, but raw numbers alone in today's world may be misleading… Consequently, some context in which to place raw statistics is reasonable."  Bose Corp. v. QSC Audio Products, Inc., 293 F.3d 1367, 63 USPQ2d 1303, 1309 (Fed. Cir. 2002).  Plaintiff has failed to offer any information concerning the number of jewelry retailers in this country, that is, the number of potential members of an organization such as plaintiff's. It is the duty of a party asserting that its mark is famous to clearly prove it.  See Blue Man Productions Inc. v. Tarmann, 75 USPQ2d 1811 (TTAB 2005).  In this case, the evidence falls far short of establishing that the MEMBER LEADING JEWELERS GUILD mark is famous.  Therefore, this duPont factor is neutral.

The next duPont factor we consider is that of actual confusion.  Plaintiff points to several incidents of what it contends is actual confusion.  James West, plaintiff's executive director, testified that he was approached at

11

jewelry industry trade shows on several occasions where individuals asked him if plaintiff and defendant were one and the same. Additionally, Mr. West testified that he received an email from a former member who asked whether plaintiff and defendant were different. Although we agree with plaintiff that, ordinarily, the occurrence of actual confusion is an indication that confusion is likely, the incidents related by Mr. West show, at most, that inquiries were made as to the relationship, if any, between plaintiff and defendant. It is not clear, however, that the persons were, in fact, confused. In other words, there is no evidence that a jewelry retailer mistakenly joined or attempted to join defendant when it intended to join plaintiff. In short, it is not clear that actual confusion has occurred. Moreover, even if some actual confusion could be inferred from plaintiff's evidence on this point, any such confusion would be de minimis. This duPont factor also is neutral.

We next consider the similarity/dissimilarity of the marks. We must determine whether plaintiff's mark MEMBER LEADING JEWELERS GUILD and design and defendant's marks LEADING JEWELERS OF THE WORLD in standard character form and in design form, when compared in their entireties, are similar or dissimilar in terms of sound, appearance, connotation and commercial impression. Although the marks

must be considered in their entireties, it is well-settled that one feature of a mark may be more significant than another, and it is not improper to give more weight to this dominant feature in determining the commercial impression created by the mark.  See In re National Data Corp., 753 F.2d 1056, 224 USPQ 749 (Fed. Cir. 1985).  Furthermore, the test is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their commercial impression that the relevant persons who encounter the respective marks would be likely to assume that there is a connection or relationship between plaintiff and defendant.  Sealed Air Corp. v. Scott Paper Co., 190 USPQ 106 (TTAB 1975).

Insofar as plaintiff's MEMBER LEADING JEWELERS GUILD and design mark is concerned, we note that the words JEWELERS GUILD have been disclaimed.  These words are highly descriptive, if not generic, of plaintiff's membership services.  Additionally, the entire phrase MEMBER LEADING JEWELERS GUILD is highly suggestive of plaintiff's membership services.  Further, we note that each of defendant's registrations for the mark LEADING JEWELERS OF THE WORLD issued on the Supplemental Register. Additionally, in defendant's applied-for mark, LEADING JEWELERS OF THE WORLD and design, the words LEADING JEWELERS

13

OF THE WORLD have been disclaimed.  Thus, there is no question that the words LEADING JEWELERS OF THE WORLD are descriptive of defendant's membership and association services.  As previously indicated, defendant also submitted two third-party registrations (owned by different entities) of marks that include the words "LEADING JEWELER" for services in the jewelry field.  They are Registration No. 1766432 for the mark AMERICA'S LEADING JEWELER for "retail store and mail order services in the field of jewelry" and Registration No. 1676439 for the mark THE AREA'S LEADING JEWELER FOR VERY GOOD REASONS for "distributorship and retail store services in the field of jewelry and watches." Although third-party registrations do not show that the public is familiar with the marks shown in the registrations, they are probative to the extent that they may show the meaning of a mark or a portion of a mark in the same way that dictionaries are employed.  See Mead Johnson & Company v. Peter Eckes, 195 USPQ 187 (TTAB 1977).  Here, Registration No. 1766432 was registered pursuant to Section 2(f), thus indicating that, in the absence of a showing of acquired distinctiveness for the mark, the words AMERICA'S LEADING JEWELER are considered descriptive.  Thus, that third-party registration, at the very least, is further evidence that the words LEADING JEWELER(S) are merely

14

descriptive for services in the jewelry field.[7] Under the circumstances, the mere presence of the words LEADING JEWELERS in the parties' respective marks is an insufficient basis on which to find the marks confusingly similar. Rather, because of the highly suggestive nature of plaintiff's mark, it is weak and not entitled to a broad scope of protection. As stated in Sure-Fit Products Co. v. Saltzson Drapery Co., 254 F.2d 158, 117 USPQ 295, 297 (CCPA 1958):

> It seems both logical and obvious to us that where
> a party chooses a trademark which is inherently
> weak, he will not enjoy the wide latitude of
> protection afforded the owners of strong
> trademarks. Where a party uses a weak mark, his
> competitors may come closer to his mark than would
> be the case with a strong mark, without violating
> his rights. The essence of all we have said is
> that in the former case there is not the
> possibility of confusion that exists in the latter
> case.

Further, the respective marks have somewhat different connotations. Plaintiff's mark, MEMBER LEADING JEWELERS GUILD and design, connotes membership in an organization or guild of leading jewelers; defendant's marks, LEADING JEWELERS OF THE WORLD, both in standard character form and with a design, connote that the members of the organization are the best, that is, that they are the world's leading

---

[7] No disclaimer or Section 2(f) claim is indicated in Registration No. 1676439, but it is USPTO policy not to require a disclaimer of individual words in a slogan mark. Thus, we do not regard this registration as showing that the words are inherently distinctive.

jewelers. In terms of appearance and sound, the respective marks obviously look similar to the extent that they include the words LEADING JEWELERS. However, we find that the remaining words in the respective marks are different and, when viewed in their entireties, the marks overall are different. Thus, this duPont factor favors a finding of no likelihood of confusion.

In sum, in view of the weakness of plaintiff's mark, when we compare the respective marks in their entireties as to appearance, sound and meaning, we find that the dissimilarities in the marks outweigh the similarities, and that the marks are likewise dissimilar rather than similar in terms of their commercial impression. Thus, after consideration of the evidence of record with respect to the relevant duPont factors, and the parties' arguments with respect thereto, we conclude that there is no likelihood of confusion in this case. That is, notwithstanding that the parties' respective marks would be encountered by the same relevant persons, we find that the marks are too dissimilar to support a determination that confusion is likely.

**Decision**: The opposition is dismissed and the petitions to cancel are denied.