THIS OPINION
IS A PRECEDENT OF THE
TTAB

Hearing:                                          Mailed:
8/2/11                                            3/20/12

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

L'Oreal S.A. and L'Oreal USA, Inc.
v.
Robert Victor Marcon

_____

Opposition No. 91184456
to application Serial No. 76596736
filed on June 9, 2004

_____

Robert L. Sherman of Paul, Hastings, Janofsky & Walker for
L'Oreal S.A. and L'Oreal USA, Inc.

Robert Victor Marcon, *pro se*.

_____

Before Quinn, Taylor and Shaw,
Administrative Trademark Judges.

Opinion by Quinn, Administrative Trademark Judge:

Robert Victor Marcon ("applicant") filed an application
to register the mark L'OREAL PARIS (in typed form) for "aloe
vera drinks" (in International Class 32). The application
includes a statement of a bona fide intent to use the mark
in commerce, and a claim of priority, pursuant to Section
44(d) of the Trademark Act, 15 U.S.C. § 1126(d), based on
Canadian application number 1202383 filed on December 11,
2003.

L'Oreal S.A. and L'Oreal USA, Inc. (together "opposer") opposed registration under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that applicant's mark, when applied to applicant's goods, so resembles opposer's previously used and/or registered L'OREAL and L'OREAL PARIS marks for a full range of cosmetics, skin care, and hair care products, some that include aloe vera as an ingredient, as well as for a variety of services, as to be likely to cause confusion. Opposer also alleges that its famous marks are likely to be diluted by registration of applicant's mark. Lastly, by way of an amended notice of opposition, opposer asserts that applicant lacks a bona fide intent to use his mark in commerce.

Applicant, in his answers to both the original notice of opposition and the amended notice of opposition, denied the salient allegations comprising the claims for relief.[1]

The record comprises the pleadings; the file of the opposed application; testimony, with voluminous related exhibits, taken by opposer;[2] certified copies of opposer's pleaded registrations and pending applications introduced by

---

[1] The Board, on November 10, 2009, entered default judgment against applicant in view of his failure to timely respond to the notice of default. Applicant then filed a motion to vacate the judgment. In an order dated January 14, 2010, the Board, while expressing its "puzzlement" over the reasons for applicant's failure to timely file an answer, nevertheless found that the failure was inadvertent, and was neither willful nor in bad faith. Accordingly, the Board vacated the default judgment.
[2] The parties stipulated to testimony by declaration. Trademark Rule 2.123(b). *See* TBMP § 703.01(b) (3d ed. 2011).

way of opposer's notice of reliance; and various documents,
including third-party registrations, excerpts from printed
publications and third-party websites, official records
(including documents relating to applicant's other filings
with the Office), and applicant's responses to opposer's
discovery requests,[3] all submitted by way of applicant's
notice of reliance. Both parties filed briefs.[4] The Board
held an oral hearing at which only opposer's counsel
appeared.

By way of background, during examination of the
application, the examining attorney issued a final refusal

---

[3] Responses to interrogatories and requests for admission may be
made part of the record by only the inquiring party. Trademark
Rule 2.120(j). However, opposer did not object to applicant's
improper introduction of such evidence, but rather treated the
evidence as being of record. Accordingly, we have considered
this evidence as having been stipulated into the record. *See*
*Riceland Foods Inc. v. Pacific Eastern Trading Corp.*, 26 USPQ2d
1883, 1884 n.3 (TTAB 1993). *See also* TBMP § 704.10.

[4] Applicant's thirty-five page brief on the case is single-
spaced. Trademark Rule 2.126(a)(1) requires that the brief be
double-spaced; and Trademark Rule 2.126(b) provides that a main
brief on the case shall not exceed fifty-five pages in length in
its entirety.

Where a brief exceeds the page limit, the Board generally will
not consider the brief. *See American Optical Corp. v. Atwood*
*Oceanics, Inc.*, 177 USPQ 585 (Comm'r 1973) (brief which was too
long and not in proper form was not considered). *See generally*
TBMP § 801.03. As opposer points out (Reply Brief, p. 1, n.1),
it is unknown whether the brief, if double-spaced, would be
within the page limitation as set forth in Trademark Rule
2.128(b). Indeed, we cannot be certain that the single-space
format was meant as a subterfuge to circumvent the rule regarding
the length of the brief. *Cf. Consorzio del Prosciutto di Parma*
*Sausage Products Inc.*, 23 USPQ2d 1894, 1896 n.3 (TTAB 1992)
(warned that single-spaced footnotes containing substantial
discussion may be viewed as a subterfuge to avoid page limit).
In any event, applicant's brief is single-spaced and, thus, the
brief is not in technical compliance with Trademark Rule

to register applicant's mark under Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a), on the ground that it falsely suggests a connection with opposer. Applicant appealed the refusal. The Board, in an unpublished opinion, reversed the refusal to register, finding that the examining attorney did not meet her burden of proving that L'OREAL is of sufficient fame or reputation to consumers in the United States that a connection between applicant's mark and opposer would be presumed. In making its determination, the Board noted the limited resources of the Office in acquiring evidence, and also "hasten[ed] to point out" that a "different and more complete record, such as might be adduced in an inter partes proceeding" may well cause the Board to reach a different result under Section 2(a). When the application was published in the Official Gazette, opposer filed its notice of opposition, although Section 2(a) is not one of the alleged claims.

The record shows that opposer is a worldwide-leading cosmetics company in terms of revenue, product volume and brand recognition, with a significant presence in the United States. Opposer introduced six of its registrations; the two registered marks closest to applicant's mark and goods are the following: L'OREAL (typed) for "hair colorings,

---

2.126(a)(1). Nevertheless, we have exercised our discretion and have considered applicant's brief.

color rinses, hair bleaches, color developers, color intensifiers, and hair conditioners" (in Class 3);[5] and L'OREAL (stylized) for "rouge, face cream, hair lotion, hand cream, eye shadow, face lotion, nail polish, suntan oil and face powder" (in Class 3).[6] Opposer also has used its L'OREAL PARIS common law mark on a variety of cosmetics and personal care products. Opposer typically uses the mark L'OREAL PARIS in the form shown below.



**STANDING**

Opposer has established its standing to oppose registration of the involved application. In particular, opposer has properly made its pleaded registrations of its L'OREAL marks of record; in addition, opposer demonstrated its use of the mark L'OREAL PARIS. Thus, opposer has shown that it is not a mere intermeddler. Opposer's use and/or registration of its marks establish that opposer has

---

[5] Reg. No. 661746, issued May 13, 1958; third renewal.
[6] Reg. No. 540541, issued April 3, 1951; fourth renewal. When a registration owned by a party has been properly made of record, and the status of the registration changes between the time it was made of record and the time the case is decided, the Board, in deciding the case, will take judicial notice of, and rely on, the current status of the registration, as shown by the records of the Office. *Nike Inc. v. WNBA Enterprises LLC*, 85 USPQ2d 1187, 1192 n.9 (TTAB 2007). *See* TBMP § 704.03(b)(1)(A). Thus, we have checked Office records to confirm that opposer renewed this registration.

standing.  *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999); and *Lipton Industries, Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

**PRIORITY**

In view of opposer's ownership of valid and subsisting registrations of its L'OREAL and L'OREAL-formative marks, opposer's priority is not in issue with respect to the goods identified in those registrations.  *King Candy, Inc. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).  Further, opposer established prior common law rights in its mark L'OREAL PARIS in connection with a variety of cosmetics and personal care products.[7]  Opposer continuously has used the mark L'OREAL PARIS since long prior to the Section 44(d) priority filing date of the involved application, which is the earliest date applicant is entitled to claim.[8]

---

[7] Applicant focused on only three of opposer's registered marks, contending, as best we understand, that those are the only marks that "predate" applicant's mark.  What applicant seems to ignore is that there can be no priority dispute when an opposer properly introduces its registrations into the record, and the applicant fails to file a counterclaim to cancel them; and that opposer also has established prior common law use of the mark L'OREAL PARIS.

[8] Applicant's allegation that opposer has abandoned its L'OREAL PARIS common law mark is not supported by the record.

## LIKELIHOOD OF CONFUSION

Our determination under Section 2(d) is based on an analysis of all of the facts in evidence that are relevant to the factors bearing on the likelihood of confusion issue. *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563 (CCPA 1973). Opposer must establish that there is a likelihood of confusion by a preponderance of the evidence. In any likelihood of confusion analysis, however, two key considerations are the similarities between the marks and the similarities between the goods and/or services. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24 (CCPA 1976). These factors, and the other relevant *du Pont* factors in the proceeding now before us, are discussed below.

## FAME

We begin with this *du Pont* factor, on which opposer has introduced a significant amount of evidence. Fame of the prior mark plays a dominant role in likelihood of confusion cases featuring a famous mark. *Bose Corp. v. QSC Audio Products Inc.*, 293 F.3d 1367, 63 USPQ2d 1303 (Fed. Cir. 2002); *Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894 (Fed. Cir. 2000); and *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.*, 963 F.2d 350, 22 USPQ2d 1453 (Fed. Cir. 1992). Because of the extreme deference accorded to a famous mark in terms of the wide latitude of legal

7

protection it receives, and the dominant role fame plays in the likelihood of confusion analysis, it is the duty of the party asserting fame to clearly prove it. *Lacoste Alligator S.A. v. Maxoly Inc.*, 91 USPQ2d 1594, 1597 (TTAB 2009); and *Leading Jewelers Guild Inc. v. LJOW Holdings LLC,* 82 USPQ2d 1901, 1904 (TTAB 2007).

Lisa Capparelli, opposer's vice president, Consumer Products Division, Integrated Marketing Communications, testified about the extent of use of opposer's L'OREAL and L'OREAL PARIS marks. Opposer (through L'Oreal USA, Inc., a wholly-owned subsidiary of L'Oreal S.A. and its exclusive licensee in the United States) has sold cosmetic and personal care products under the L'OREAL and L'OREAL PARIS marks in the United States for over fifty years. Opposer has sold these products at drug stores, supermarkets and mass merchandisers throughout the United States, including Walmart, Target, Kmart, Rite-Aid, Walgreens, CVS and Kroger, and through online retail websites such as www.drugstore.com.

As early as 1980, annual U.S. sales under the L'OREAL and L'OREAL PARIS marks stood at over $200 million, tripling to $600 million by 1984. Sales under the L'OREAL PARIS mark for the period 2000 through 2003 were approximately $4 billion, with sales increasing for the period from 2004 through 2009 to $7 billion. Current annual sales of

products sold under the L'OREAL PARIS mark are approximately $1.2 billion. Several of opposer's product lines, all sold under the L'OREAL PARIS mark, were each among the top ten by market share in their respective product categories; in 2004, the year that applicant filed his application, these product lines alone generated more than $600 million in sales. Opposer's skin care products sold under the mark L'OREAL PARIS rank as the third-best selling mass skin care brand in the United States.

Opposer supports its L'OREAL and L'OREAL PARIS marks with substantial advertising and promotional expenditures. For the years 2000 through 2004, opposer spent more than $200 million annually to advertise products under the L'OREAL PARIS mark in the United States. For each of the years 2005 through 2009, opposer's advertising expenditures to promote its L'OREAL PARIS mark in the United States increased to over $300 million. Opposer's promotional expenditures consistently rank among the highest in the United States; for the past decade, opposer has been among the top thirty national advertisers, as ranked by the annual report of "100 Leading National Advertisers" in Advertising Age magazine.

Opposer's television commercials have run during broadcasts of the Super Bowl, Project Runway, the Academy Awards, the Golden Globes, and the Screen Actors Guild

9

Awards.  Opposer's advertising for its L'OREAL and L'OREAL PARIS marks have featured famous spokespersons, including Scarlett Johansson, Beyonce Knowles, Claudia Schiffer, Penelope Cruz and Andie MacDowell.

In connection with its promotional efforts, opposer has engaged in significant and well-publicized corporate fundraising.  Opposer has partnered with the Ovarian Cancer Research Fund, raising more than $18 million; with UNESCO in the "For Women In Science Program"; and with Glamour magazine's "Women of the Year" awards.

Opposer's substantial sales revenues and promotional expenditures have paid off in significant brand recognition and goodwill for its L'OREAL and L'OREAL PARIS marks. Interbrand Corporation and Business Week magazine consistently rank opposer in their annual report of the world's "100 Top Brands."

Opposer and its marks have enjoyed significant unsolicited media coverage in national publications such as The New York Times, The Wall Street Journal, and The Washington Post.  Advertising Age, in an article titled "Sharp Print, Sharp Colors Score for L'Oreal," noted that opposer "succeeded in building an upscale brand image among mass brands," and in the process became "the largest spender in the beauty category."

Opposer has commissioned a "Corporate Image Study" every year from 2001 through 2007; the study covers a variety of consumer factors, including brand awareness. Mark Brooks, opposer's vice president, Consumer Products Division, Consumer & Market Intelligence, testified about the results. The specific numbers of the studies are designated as "confidential," so we are not at liberty to disclose them. What we can say is that the brand awareness and brand image numbers are very impressive, and of a magnitude that would be the envy of any business entity in this country.

Numerous products sold under the L'OREAL PARIS mark have won awards or commendations from publications such as Cosmopolitan, Elle, Glamour, Good Housekeeping, Shape and Vogue.

Despite opposer's evidence of fame, applicant makes the incredible statement that this factor "strongly supports the [applicant]," arguing that opposer's fame is primarily associated with its cosmetic products. (Brief, p. 24). Applicant's argument that opposer is famous only with respect to its cosmetic products, and that this factor "strongly supports" applicant is incorrect. Assuming that applicant is correct that opposer is famous (only) for its cosmetic products, the effect of such fame is that customers are more likely to presume an association with opposer

11

whenever the same or similar mark is used on *other* products, even if they are not as closely related as might otherwise be required. In other words, a finding that a mark enjoys significant fame expands the scope of protection which might be accorded a lesser-known mark. Moreover, as a matter of law, the fame of a registered or previously used mark can never support a junior party; this *du Pont* factor can only support the senior party. *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.*, 22 USPQ2d at 1456.

Applicant makes two other ill-fated attempts to diminish the distinctiveness of opposer's marks. The first centers on what appears to be applicant's argument that "L'Oreal" and "Paris" are surnames and, in support thereof, applicant submitted evidence showing that an extremely modest number of Americans have a surname of "Loreal," "Oreal" or "Paris." The second argument is that opposer's L'OREAL PARIS mark is primarily geographically descriptive.

Suffice it to say, these arguments are entirely unpersuasive. Opposer's record establishing fame essentially stands unrebutted by applicant.

Based on the impressive record before us, we find that opposer's marks L'OREAL and L'OREAL PARIS are famous for cosmetics and personal care products such as makeup, skin care, hair care, and hair color, among others. "When an opposer's trademark is a strong, famous mark, it can never

12

be of little consequence." *Recot Inc. v. M.C. Becton*, 54 USPQ2d at 1897, quoting *Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.*, 748 F.2d 669, 223 USPQ 1281, 1284 (Fed. Cir. 1984). The Federal Circuit has stated repeatedly that there is no excuse for even approaching the well-known trademark of a competitor inasmuch as "[a] strong mark...casts a long shadow which competitors must avoid." *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.*, 22 USPQ2d at 1456.

We find the *du Pont* factor focusing on fame weighs heavily in favor of finding a likelihood of confusion herein.

## THE MARKS

We must compare opposer's marks to applicant's mark in their entireties as to appearance, sound, connotation and commercial impression to determine the similarity or dissimilarity between them. *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005). The test, under the first *du Pont* factor, is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression that confusion as to the source of the goods offered under the respective marks is likely to result. The focus is on the recollection

13

of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106 (TTAB 1975).

To state the obvious, applicant's L'OREAL PARIS mark is identical to opposer's L'OREAL PARIS mark in sound and appearance; further, there is no indication that applicant's proposed use would result in his mark having a different connotation or commercial impression than the mark as used by opposer.

In addition, applicant's L'OREAL PARIS mark is substantially similar to opposer's L'OREAL mark. It is well settled that one feature of a mark may be more significant than another, and it is not improper to give more weight to this feature in determining the commercial impression created by the mark. *In re National Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985) ("There is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties. Indeed, this type of analysis appears to be unavoidable."). In applicant's mark, the term L'OREAL is the first component, and purchasers in general are inclined to focus on the first word or portion in a trademark. *Presto Products, Inc. v. Nice-Pak Products, Inc.*, 9 USPQ2d 1895, 1897 (TTAB 1988) ("it is often the

14

first part of a mark which is likely to be impressed upon the mind of a purchaser and remembered"). *See Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 73 USPQ2d at 1692. Given the geographically descriptive nature of the term PARIS, purchasers are more likely to remember the L'OREAL portion of applicant's mark, and would rely upon this term to identify, call for, or refer to the goods. This term is identical to the entirety of opposer's L'OREAL mark. In sum, the marks L'OREAL and L'OREAL PARIS are highly similar in sound, appearance, meaning and overall commercial impression.

The identity or substantial similarity between the marks weighs heavily in opposer's favor.

## THIRD-PARTY USES

Applicant's evidence of use of "O'real" with a fried chicken mix, or as a given name "Oreal" is unpersuasive. "O'real" and "Oreal" have different commercial impressions from L'OREAL; whether consumers can distinguish between opposer's L'OREAL mark and the third-party uses of either "O'real" or "Oreal" for the respective goods does not mean that they will distinguish between the parties' identical or substantially similar marks L'OREAL and L'OREAL PARIS involved herein.

In a related argument, applicant points to the co-existence of third-party registrations of identical marks,

15

owned by different parties, for arguably related goods (e.g., TRIUMPH, SPITFIRE and TEMPEST). Applicant's attempt to equate those co-existing registrations, for each of those marks, with the situation herein is not persuasive. Suffice it to say that each case must be decided on its own set of facts.

This factor is neutral in our analysis.

**THE GOODS**

It is well established that the goods of the parties need not be similar or competitive, or even offered through the same channels of trade, to support a holding of likelihood of confusion. Further, "the greater the degree of similarity in the marks, the lesser the degree of similarity that is required of the products or services on which they are being used in order to support a holding of likelihood of confusion." *In re Concordia International Forwarding Corp.*, 222 USPQ 352, 356 (TTAB 1983). Where, as in this case, applicant's mark is identical to opposer's L'OREAL PARIS mark, there need only be a viable relationship between the goods to find that there is a likelihood of confusion. *See In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1689 (Fed. Cir. 1993) (contemporaneous use of identical or nearly identical marks can lead to the assumption that there is a common source "even when [the] goods or services are not competitive or intrinsically

16

related"); and *In re Thor Tech Inc.*, 90 USPQ2d 1634, 1636 (TTAB 2009). The issue here, of course, is not whether purchasers would confuse the parties' goods, but rather whether there is a likelihood of confusion as to the source of the goods. *In re Rexel Inc.*, 223 USPQ 830 (TTAB 1984).

Although the record also establishes opposer's prior rights in its marks as used in connection with various services, we will focus our attention, as have the parties, on a comparison of opposer's cosmetics and personal care products to applicant's aloe vera drinks.

At first glance, cosmetics and beverages might not appear to be inherently related. But, as discussed below, opposer has submitted substantial evidence to show several reasons for finding such goods to be related. The record includes the declaration of Natalie Furman, an attorney at opposer's law firm, and related exhibits. Ms. Furman attests to her firm's Internet search, and the results showing that the same companies offer both cosmetics and food/beverage products. (Furman dec., Ex. J).[9] Exhibit J includes excerpts of third-party websites and registrations which, in combination, show that a single entity may offer

---

[9] The introduction of Internet materials as exhibits to testimony is, of course, appropriate. It should be noted that the Board, in *Safer, Inc. v. OMS Investments, Inc.*, 94 USPQ2d 1031 (TTAB 2010), changed its practice regarding Internet evidence, holding that a document obtained from the Internet may be admitted into evidence pursuant to a notice of reliance in the same manner as a

both cosmetic and beverage products under the same mark. Examples include the following: SKINCOLA (RN 3025036 for hydrating facial mist and face soap, and RN 2916930 for mineral and aerated waters); BORBA (RN 3083944 for cosmetics, and use in connection with drinkable "clarifying skin balance" water); EVIAN (RNs 2904034, 2821896 and 2822102 for cosmetics and dietary drink mix, and fruit and vegetable juice, and spring and aerated waters); AQUAFINA (RN 1917411 for soft drinks, mineral water, and aerated water, and RN 3214155 for lip gloss, RN 3170128 for exfoliants for lips, RN 3360445 for skin and face moisturizers, and RN 3591147 for eye cream, facial cleansers and skin cleansers); PEPSI TWIST (RN 3170159 for lip balm, and use for soft drinks); MOUNTAIN DEW (RN 3353706 for lip balm, and use for soft drinks); and SNAPPLE (RN 3233387 for personal care products namely body scrub, body wash, and soap for the body, and use for beverages). With respect to some of these examples, "[t]hird-party registrations which cover a number of differing goods and/or services, and which are based on use in commerce, although not evidence that the marks shown therein are in use on a commercial scale or that the public is familiar with them, may nevertheless have some probative value to the extent that they may serve to suggest

---

printed publication in general circulation in accordance with Trademark Rule 2.122(e). *See* TBMP § 704.08(b).

that such goods or services are of a type which may emanate from a single source." *In re Mucky Duck Mustard Co.*, 6 USPQ2d 1467, 1470 n.6 (TTAB 1988), *aff'd*, 864 F.2d 149 (Fed. Cir. 1988). *See also In re Albert Trostel & Sons Co.*, 29 USPQ2d 1783, 1785-86 (TTAB 1993).

Opposer made of record an article discussing the trend of "traditional skin care lines improving looks with dietary supplements." (www.entrepreneur.com):

> Cosmetic and skin care companies both in the U.S. and abroad are beginning to address the older consumer's desire for product lines that marry cosmeceuticals and nutraceuticals to smooth and improve skin. Avon, the aptly monikered "company for women," has been fully vested in the idea of beauty from the inside out. "Women's health and well-being is a natural extension of Avon's beauty focus," said Avon CEO Andrea Jung at the time of Avon's Wellness launch. "Our research around the world shows that women today are vitally concerned about inner health as well as outer beauty."
>
> Two new additions to the Avon Wellness line are Healthy Remedies Balancing Lotion, and VitAdvance AquaNew. One you smooth on, the other, you swallow.
>
> *****
>
> Skin care lines widely known in the U.S. for their topical anti-aging products are prospering in Europe and Asia with product lines that focus on promoting beauty from within.
>
> *****
>
> L'Oreal, Paris, France, joined forces with Nestle, Vivey, Switzerland, almost

19

> two years ago to...develop nutritional
> supplements with a cosmetic bent...[to]
> "improve the quality of skin, hair and
> nails by supplying nutrients essential
> to their physiology."

*****

> Both Lynn Laboranti, M.S., R.D., of the
> Professional Education Department of
> Pharmavite, and Dr. Amy Newburger, a New
> York City, NY-based dermatologist and
> the author of Looking Good at Any Age,
> shared their thoughts on midlife women,
> skin care and the wisdom of combining
> nutraceuticals and cosmeceuticals to
> promote healthy skin.  "I believe that
> today's woman is looking for a holistic
> solution.  Vitamins and topical
> solutions can work synergistically to
> make women look and feel their best,"
> stated Ms. Laboranti.

Ms. Capparelli testified that opposer is an innovator in the personal care market, and that consumers have come to expect new and different types of products under the L'OREAL and L'OREAL PARIS marks.  Other evidence shows that Procter & Gamble has expanded its "well-known skin care line OLAY" to a vitamin line under the identical mark OLAY to "support beauty from within."  (www.entrepreneur.com).

Additional evidence that the parties' goods are related is the common use of aloe vera as an ingredient in cosmetics and personal care products.  According to Ms. Capparelli, consumers are aware that aloe or aloe vera is often prominently listed as a beneficial ingredient in moisturizers and other skin care products.  Opposer itself uses aloe vera and other botanicals in a number of its

20

products.  The connection between aloe and cosmetics is further reflected by numerous third-party registrations of ALOE-formative marks for cosmetic products, many of which are identified as containing aloe vera as an ingredient.

As shown by the record, companies have marketed cosmetics and beverages under the same mark; further, aloe vera is commonly used as an ingredient in cosmetic and personal care products.  The evidence also shows the growing relationship between "inner health" products (e.g., beverages and nutritional supplements) and "outer beauty" products (e.g., cosmetics and personal care products). Accordingly, we find that the parties' goods are sufficiently related for purposes of our likelihood of confusion analysis, and this factor weighs in favor of opposer.

## TRADE CHANNELS, PURCHASERS and CONDITIONS OF SALE

Inasmuch as there are no restrictions in applicant's identification and the identifications in opposer's registrations, it is presumed that the identifications encompass all goods of the type described, that they move in all normal trade channels for such goods, and that they are available to all potential consumers for such goods.  *Paula Payne Products Co. v. Johnson Publishing Co.*, 473 F.2d 901, 177 USPQ 76, 77 (CCPA 1973); and *Tea Board of India v. Republic of Tea Inc.*, 80 USPQ2d 1881, 1897 (TTAB 2006).  The

normal trade channels for cosmetics and beverages include supermarkets, drug stores and mass merchandisers. Further, with respect to common law rights in its mark L'OREAL PARIS, opposer has shown that its goods actually are sold in these same types of stores. Thus, the trade channels for the parties' goods overlap.

We also presume that applicant's drinks will be sold to the same classes of purchasers as opposer's goods, including ordinary consumers. Applicant's contention that purchasers of opposer's products are "quite sophisticated and meticulous" is not supported by any evidence. (Brief, p. 22). In this connection, we note that opposer's identifications of goods are not restricted as to price and, therefore, we must presume that opposer's cosmetics include ones that are inexpensive.

Products such as opposer's cosmetics and personal care products, as well as nutritional drinks, tend to be relatively inexpensive and may be the subjects of impulse purchases. *See Wet Seal Inc. v. FD Management Inc.*, 82 USPQ2d 1629, 1640-41 (TTAB 2007). "When products are relatively low-priced and subject to impulse buying, the risk of likelihood of confusion is increased because purchasers of such products are held to a lesser standard of purchasing care." *Recot Inc. v. M.C. Becton*, 54 USPQ2d at 1899.

22

These factors relating to the similarity between the trade channels, classes of purchasers and conditions of sale weigh in opposer's favor.

**BAD FAITH ADOPTION**

Under the thirteenth *du Pont* factor, evidence of applicant's bad faith adoption of his mark is relevant to our likelihood of confusion analysis. *L.C. Licensing Inc. v. Berman*, 86 USPQ2d 1883, 1890 (TTAB 2008). *See J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 18 USPQ2d 1889, 1891 (Fed. Cir. 1991) ("Whether there is evidence of intent to trade on the goodwill of another is a factor to be considered, but the absence of such evidence does not avoid a ruling of likelihood of confusion."); *Jacobs v. International Multifoods Corp.*, 668 F.2d 1234, 212 USPQ 641, 643 (CCPA 1982) (Nies, J., concurring opinion) ("The absence of intent to confuse would not preclude a finding of likelihood of confusion, but had such intent been shown (which it has not), it would be a factor to weigh against the newcomer."); and *Lever Bros. Co. v. Riodela Chemical Co.*, 41 F.2d 408, 5 USPQ 152, 154-55 (CCPA 1930) ("[W]e have a right, in determining the question of likelihood of confusion or mistake, to consider the motive in adopting the mark as indicating an opinion, upon the part of one vitally interested, that confusion or mistake would likely result from the use of the mark.").

We agree with opposer's accusation that "applicant has a history and pattern of filing intent-to-use applications for a disparate range of products for which he has no industry-relevant experience, and where the applied-for marks are identical to some of the best known, previously registered trademarks in the country." (Brief, p. 24).[10] The sixteen applications were based on intent to use and/or foreign filings; in all but one case (HEINEKEN), the applications were abandoned. Applicant sought to register the following marks: HEINEKEN for meat juices (SN 78288366, currently suspended pending receipt of the foreign registration); JACK DANIEL'S for cigars, cigarettes and chewing tobacco (SNs 76596734 and 78288359); CHANEL for scented stationery and greeting cards (SN 76596733); SOUTHERN COMFORT for various beverages such as beer, water and juices (SN 78288368); BAYER for non-medicated mouthwash, gargle and breath fresheners (SN 76596737); ABSOLUT (SN 78288367) and ABSOLUT WATER (SN 78230510) for various beverages such as beer, water and juices; FINLANDIA for various beverages such as water, juices and flavored drinks (SN 78288365); COORS for meat juices and meat juice concentrates (SN 78288364); BUDWEISER for various beverages

---

[10] Opposer also refers to these third-party trademarks as "well-known or famous," a characterization not disputed by applicant. (Brief, p. 25). Thus, for purposes of this decision, we will presume that the marks are "well-known."

24

such as water, juices and non-alcoholic beverages (SN 78288361); DOM PERIGNON for meat juices and broth (SN 78288358); NESCAFÉ for alcoholic beverages (SN 76596735); EVIAN for distilled spirits, ice cream, sherbet, and frozen confections (SN 76577011); NESTLÉ for vitamins, analgesics and alcoholic beverages (SN 76596738); and TIM HORTONS for alcoholic beverages (SN 76577010). (Opposer's notice of reliance, Exs. C1-C18).

Applicant's demonstrated pattern of filing applications to register various well-known marks convinces us that applicant's adoption of the L'OREAL PARIS mark was in bad faith, with the intention to trade off of opposer's famous L'OREAL and L'OREAL PARIS marks.[11] Such bad faith is strong evidence that confusion is likely, as such an inference is drawn from the imitator's expectation of confusion. *L.C. Licensing Inc. v. Berman*, 86 USPQ2d at 1891. We hasten to add that, even if there were no bad faith adoption by applicant, we would have no hesitation in finding a likelihood of confusion between the parties' marks. *Greyhound Corp. v. Both Worlds Inc.*, 6 USPQ2d 1635, 1640 (TTAB 1988) (lack of intent to trade on another's mark will

---

[11] We caution that our consideration of this pattern is inextricably linked to the unique facts of this case and do not suggest that it would usually be appropriate for a party alleging bad faith adoption of a mark to take extensive discovery about other, unrelated applications filed by the applicant. In this particular case, the demonstrated pattern is material.

not prevent a finding of likelihood of confusion when the involved marks are likely to cause confusion).  The fact remains that a newcomer has both the opportunity and obligation to avoid confusion.  Consequently, a party which knowingly adopts a mark similar to one used by another for related goods should not be surprised to find scrutiny of the filer's motive.  *See, e.g., Kimberly-Clark Corp. v. H. Douglas Enterprises, Ltd.*, 774 F.2d 1144, 227 USPQ 541, 543 (Fed. Cir. 1985).

The Federal Circuit's language is instructive:

> The law has clearly been well settled for a longer time than this court has been dealing with the problem to the effect that the field from which trademarks can be selected is unlimited, and there is therefore no excuse for even approaching the well-known trademark of a competitor, that to do so raises "but one inference – that of gaining advantage from the wide reputation established by appellant in the goods bearing its mark," and that all doubt as to whether confusion, mistake, or deception is likely is to be resolved against the newcomer, especially where the established mark is one which is famous and applied to an inexpensive product bought by all kinds of people without much care.

*Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.*, 223 USPQ at 1285, *quoting Planters Nut & Chocolate Co. v. Crown Nut Co., Inc.*, 305 F.2d 916, 134 USPQ 504, 511 (CCPA 1962).  *See also Kenner Parker Toys Inc. v. Rose Art Industries, Inc.*, 22 USPQ2d at 1456.

Given the number of applications that applicant has filed seeking registration of well-known marks, we find it highly unlikely that adoption of these marks was an unintended coincidence. To the contrary, this evidence strongly suggests that applicant filed this application and others in an effort to trade off of the goodwill of the prior registrants. This factor weighs against applicant and in favor of opposer.

## LIKELIHOOD OF CONFUSION
### CONCLUSION

We conclude that consumers familiar with opposer's cosmetic and personal care products sold under its famous L'OREAL and L'OREAL PARIS marks would be likely to mistakenly believe, upon encountering applicant's L'OREAL PARIS mark for aloe vera drinks, that the goods originated from or are associated with or sponsored by opposer.

## LACK OF BONA FIDE INTENT TO USE

Opposer urges that the cumulative effect of the facts surrounding applicant's adoption of the mark L'OREAL PARIS – "including Applicant's complete lack of documentary evidence or any other objective evidence that he can/will use the mark, lack of capacity or experience needed to manufacture or otherwise offer the identified goods, vague allusions to use through licensing or outsourcing, failure to take any concrete actions or to develop any concrete plans for use

27

and, most importantly, applicant's pattern of filing intent-to-use applications for disparate goods under the well-known or famous marks of others" – demonstrates that applicant lacks the requisite bona fide intent to use his mark in commerce for aloe vera drinks. (Brief, p. 25).

Trademark Act Section 1(b), 15 U.S.C. § 1051(b), states that "a person who has a bona fide intention, under circumstances showing the good faith of such person, to use a trademark in commerce" may apply for registration of the mark. A determination of whether an applicant has a bona fide intention to use the mark in commerce is an objective determination based on all the circumstances. *Lane Ltd. v. Jackson International Trading Co.*, 33 USPQ2d 1351, 1355 (TTAB 1994); and *Commodore Electronics Ltd. v. CBM Kabushiki Kaisha*, 26 USPQ2d 1503, 1507 (TTAB 1993). Opposer has the burden of demonstrating by a preponderance of the evidence that applicant lacked a bona fide intent to use the mark on the identified goods. In *Commodore*, the Board held that "absent other facts which adequately explain or outweigh the failure of an applicant to have any documents supportive of or bearing upon its claimed intent to use its mark in commerce, the absence of documentary evidence on the part of an applicant regarding such intent is sufficient to prove that applicant lacks a bona fide intention to use the mark in commerce as required by Section 1(b)." *Id*. at 1507. *See*

*also Honda Motor Co. v. Winkelmann*, 90 USPQ2d 1660 (TTAB 2009); *Boston Red Sox Baseball Club LP v. Sherman*, 88 USPQ2d 1581 (TTAB 2008); and *L.C. Licensing Inc. v. Berman*, 86 USPQ2d at 1891-92.

Opposer has met its burden of demonstrating applicant's lack of a bona fide intent to use the mark. In the present case, applicant has stated that he has no documents evidencing a bona fide intent to use the L'OREAL PARIS mark for aloe vera drinks. (Response to Document Requests Nos. 4, 9 and 10). Applicant also admits that he has no industry-relevant experience or any expertise in manufacturing or selling aloe vera drinks. (Response to Requests for Admission No. 45). Applicant has not developed a business plan, contacted any potential business partners or investors, developed any logos or packaging, or undertaken any other concrete activities in preparation for use of the applied-for mark in connection with the goods. (Response to Interrogatories, Nos. 5 and 11).

We agree with opposer's assessment that the cumulative effect of the record – including applicant's complete lack of documentary evidence or any other objective evidence that he can/will use the mark, lack of capacity or experience needed to manufacture or otherwise offer his identified goods, vague allusions to using the mark through licensing or outsourcing, and failure to take any concrete actions or

to develop any concrete plans for using the mark –
demonstrates that applicant objectively lacks the requisite
bona fide intent to use the L'OREAL PARIS mark in commerce
for aloe vera drinks.  *SmithKline Beecham Corp. v.
Omnisource DDS LLC*, 97 USPQ2d 1300, 1304-05 (TTAB 2010);
*Saul Zaentz Co. v. Bumb*, 95 USPQ2d 1723, 1726-30 (TTAB
2010); and *Research In Motion Limited v. NBOR Corp.*, 92
USPQ2d 1926, 1930-31 (TTAB 2009).

Applicant's very generalized and non-specific reference
to licensing and outsourcing as potential strategies to
bring the product to the market at an unspecified time in
the future (accompanied by printouts of third-party websites
of aloe vera suppliers) is, to say the least, woefully
deficient in showing a bona fide intent to use the mark.
(Response to Requests for Admission No. 46).  Applicant made
no contact with these entities, and the fact that applicant
merely is aware of manufacturers of aloe vera juice who are
willing to make private label products for others like
applicant hardly establishes the bona fide intent of
applicant to produce an aloe vera drink.

So as to be clear, the record is devoid of facts
showing the efforts applicant has taken to commence use of
the marks, such as product design efforts, manufacturing
plans, graphic design efforts, test marketing,
correspondence with prospective licensees or suppliers,

preparation of marketing plans or business plans, creation of labels, marketing or promotional materials, steps to comply with regulatory requirements, securing of financing, and the like.  Moreover, there is no record evidence that applicant is now or ever was in the business of producing aloe vera drinks or any other food or beverage product.  Simply put, there are no concrete activities to corroborate applicant's bald allegation that he has a bona fide intent to use the mark in commerce.

Another basis for finding no bona fide intent to use is applicant's demonstrated pattern of filing intent-to-use applications for disparate goods under the well-known (even famous) marks of others—applications which almost always have been abandoned.  As recounted above, applicant has filed sixteen intent-to-use applications to register well-known marks, albeit different marks than the one involved herein; in all but one case, the applications were abandoned.[12]  The legislative history of the Trademark Law Revision Act of 1988 provides several specific examples of

---

[12] We note that in some of applicant's other applications, registration was sought under Section 44 of the Trademark Act, 15 U.S.C. § 1126, based on registration of the same mark in another country.  While such applicants are excused from the requirement in Section 1 of the Trademark Act that the mark be in use prior to registration, they must nonetheless state that they have (and must in fact possess) a bona fide intent to use the mark in United States commerce.  Section 44(e) of the Trademark Act ("The application must state the applicant's bona fide intention to use the mark in commerce, but use in commerce shall not be required prior to registration.").

objective circumstances which, if proven, "may cast doubt on the bona fide nature of the intent or even disprove it entirely." S. Rep. No. 100-515, 100th Cong. 2d Sess. at 23-24 (1988), quoted in *Lane Ltd. v. Jackson International Trading Co.*, 33 USPQ2d at 1355. These circumstances include where the applicant filed an excessive number of intent-to-use applications to register marks which ultimately were not actually used; and where the applicant filed an excessive number of intent-to-use applications in relation to the number of products the applicant is likely to introduce under the applied-for marks during the pendency of the applications. Although these examples may be specifically distinguishable from the situation herein, the present circumstances qualify as another example of a lack of a bona fide intent to use a mark.

Notwithstanding the above, applicant persists in maintaining that he "has vigorously pursued commercialization" and that "these commercialization efforts were always conducted in a forthright manner utilizing business practices commonly found and accepted throughout the United States and the world." These actions, applicant argues, "are the actions of an applicant whose motives are genuine, sincere, and honest for the applicant has consistently proceeded in a course of action that is logical and reasonable, obeying all current trademark regulations as

written and intended instead of dishonestly pursuing commercialization via fraudulent, dishonest or unethical means." (Brief, p. 32).

Applicant's mere statements that he intends to use the mark L'OREAL PARIS, and his denial that he lacked a bona fide intent, do not establish, in fact, that he had a bona fide intent to use the mark in commerce when he filed the involved application. *Lane Ltd. v. Jackson International Trading Co.*, 33 USPQ2d at 1355 ("applicant's mere statement of subjective intent, without more, would be insufficient to establish applicant's bona fide intent to use the mark in commerce"). Evidence bearing on bona fide intent

> is "objective" in the sense that it is evidence in the form of real life facts and by the actions of the applicant, not by the applicant's testimony as to its subjective state of mind. That is, Congress did not intend the issue to be resolved simply by an officer of applicant later testifying, "Yes, indeed, at the time we filed that application, I did truly intend to use the mark at some time in the future."

J.T. McCarthy, McCarthy on Trademarks and Unfair Competition, § 19:14 (4th ed. 2009). Here, the complete lack of documentation or testimony or any other objective evidence of applicant taking any concrete steps toward commercial use of the applied-for mark clearly outweighs any subjective (or even sworn) intent to use the mark. Applicant's blatant attempt to obtain registrations of third

parties' well-known marks, and subsequent abandonment of those applications provides significant, additional support for our conclusion.

Accordingly, we find that applicant lacks a bona fide intent to use the mark in commerce.

## DILUTION

In view of the decision to sustain the opposition on the grounds of likelihood of confusion, and applicant's lack of bona fide intent to use, it is not necessary to consider opposer's dilution claim.

## DECISION

We have carefully considered all of the evidence made of record pertaining to the issue of likelihood of confusion and bona fide intent, as well as all of the parties' arguments related thereto, including any evidence and arguments not specifically discussed in this opinion. As highlighted by opposer in its reply brief in several instances, some of applicant's arguments are extremely strained or irrelevant, while others are disingenuous or verge on being incomprehensible. We have not belabored this opinion with a discussion of such arguments; for those we have not mentioned, we simply note that we have found them unpersuasive.

The opposition is sustained on the grounds of likelihood of confusion, and lack of a bona fide intent to use the mark, and registration to applicant is refused.